UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS, d.b.a. ACERTHORN                             PLAINTIFF

VS.                    CASE NO. 3:21-cv-04184-JSC

KARL POLANO, d.b.a. SOFIANNP                                 DEFENDANT

## COMPLAINT

COMES NOW, pro se Plaintiff David Stebbins, who hereby submits the following complaint to the Court for two counts of copyright infringement, one count of knowing material misrepresentation in violation of 17 USC §512(f)(2), and for the common law tort of intentional infliction of emotional distress.

### JURISDICTION AND VENUE

1. This court has proper subject-matter jurisdiction over this case. It has "federal question" jurisdiction over the copyright infringements as well as the violation of 17 USC §512(f)(2), and it has supplemental jurisdiction over the tort of intentional infliction of emotional distress.

2. This Court has personal jurisdiction over the Defendant because, as will be explained later in this Complaint, when the Defendant issued his DMCA Counter-Notification with the website of Youtube.com, he stated, in pertinent part, "I consent to the jurisdiction of the Federal District Court ... if my address is outside of the United States, the judicial district in which YouTube is located." Youtube is headquartered in San Bruno, CA, which is located in the Northern District of California. Therefore, that is where the Defendant has consented to be sued.

### FACTS OF THE CASE

3. The following facts are necessary to understand Plaintiff's entitlement to relief:

### BACKGROUND

4. Plaintiff is a Youtuber and a Twitch Streamer. He has channels on both websites, where he goes by the online alias "Acerthorn." His channels can be found by going to the URL's of www.youtube.com/acerthorn and www.twitch.tv/acerthorn, respectively. He uses both channels as a part-time source of income and hopes to one day use them as a full-time source of income. The Defendant is also a youtuber and twitch streamer, who goes by the online alias "SofiannP." His channels can be found at the URL's of https://www.youtube.com/sofiannp and www.twtich.tv/sofiannp, respectively.

5. The Defendant can be served with process at the following name and address:

Karl Sofiann Axel Polano
Regensbergstrasse 120
Zurich, Zurich 8050 CH
Switzerland

6. On April 10, 2021, Plaintiff accidentally broadcast a livestream on Twitch. His livestreaming software came on by accident, without Plaintiff realizing it. Therefore, people who were following Plaintiff's Twitch channel were able to see Plaintiff in his daily, personal life. For the most part, this livestream contained nothing of note (after all, it was unplanned, so Plaintiff obviously did not plan any content or performance for it). It mostly depicted Plaintiff eating some hot dogs and watching some viral videos on the Internet for his own personal amusement, while walking around his own apartment.

7. However, there was one moment in the accidental livestream where some bizzare sounds were played on the livestream. Upon review, Plaintiff can best describe these sounds as that of a dog barking, snarling, growling, and then whimpering in pain. Plaintiff does not have a dog, and he does not know what exactly these sounds were, but what exactly they are is ultimately immaterial to the current case anyway.

8. Regardless of what they were, because the livestream was unplanned and accidental, these strange noises were the only even remotely interesting thing that happened in the accidental livestream. As such, the moments when these strange noises occurred constitute the "heart" (or most memorable part) of the livestream, for purposes of a fair use determination.

9. Despite this livestream being an accident, Plaintiff has nonetheless registered this video with the U.S. Copyright Office and therefore has standing to sue for copyright infringement.

10. Plaintiff put the accidental livestream on his Youtube channel, but he set it up so that only those who paid his Youtube channel a minimum recurring fee of $20 per month (known as "channel memberships" in Youtube jargon) could see it.

## DEFENDANT'S HARASSMENT AGAINST PLAINTIFF

11. Beginning in mid-April 2021, Defendant developed a passionate hatred towards Plaintiff for reasons Plaintiff can only speculate on. He became completely obsessed with Plaintiff, digging up his personal history and personal information. He has proceeded to dig up nearly every single itty bitty sin that Plaintiff has ever committed, and has begun publishing this personal information on his Twitch and Youtube channels (a form of harassment known in Internet parlance as "doxxing").

12. He has also watched Plaintiff's communities (including his Youtube and Twitch channels, as well as his Discord server which is associated with those channels). Defendant has been monitoring those communities like a vulture, noticing whenever any new viewers or fans come into the communities. He will then privately message those new viewers and expose every sin he

can possibly accuse Plaintiff of, in an attempt to get them to likewise despise Plaintiff. This has the (very much intended) effect of stopping – or at the very least heavily slowing down – the growth of Plaintiff's fanbase and community, thereby sabotaging Plaintiff's aforementioned aspirations of turning these channels into a full-time career.

13. The Defendant has allowed members of his own Discord server (known as "Great Six") to post infringing clips of Plaintiff's livestreams and Yotuube videos. Defendant has permitted and even actively encouraged this infringement. Plaintiff has had at least a dozen of these clips taken down by Discord, Inc. using DMCA Takedown Notices.

14. In addition to all of this public harassment, he has also harassed Plaintiff directly, issuing excessively vulgar statements including (but not limited to) the following towards the Plaintiff:

  (a) "Go teach yourself about law you <expletive> moronic fat pig."

  (b) "I'm losing my <expletive> patience with your single digit American pig brain."

  (c) "Why make yourself public, PIG <expletive>? Answer, PIG <expletive>!"

  (d) "Read that carefully and get that in your thick <expletive> skull, you numbnut."

  (e) "Well fair use you <expletive> <expletive>, it's not entirely of your <expletive> content stream we've uploaded did we?"

  (f) "I swear this 32 ball of fat manchild is incredible."

15. Plaintiff has taken screenshots of most of these harassments. Suffice to say, the Defendant has clearly been engaging in a pattern of willful and malicious harassment over the past few weeks.

### DEFENDANT'S MAY 20, 2021 COPYRIGHT INFRINGEMENT

16. On May 20, 2021, Defendant uploaded a video to his Youtube channel. This video was 50 seconds long. Forty-three of those 50 seconds were comprised of a clip from Plaintiff's accidental livestream, where the aforementioned strange noises occurred. These clips were entirely unmodified by Defendant. The only thing the Defendant did that was even remotely a new thing was bookend this livestream clip with clips from a gum commercial. This video – if it were ever reinstated to Youtube – could be found at the following URL:

http://www.youtube.com/watch?v=-xL0xoU2cJA

17. First of all, there is no legal way the Defendant could possibly have obtained the footage from Plaintiff's accidental livestream in order to make this video in the first place. It was originally broadcast on Twitch, but Twitch has no mechanism in place to allow people to

download someone else's streams to their computer. It is now on Youtube, but it is only accessible if you pay Plaintiff $20 per month, and Plaintiff knows for a fact that the Defendant has not done that.

18.     Therefore, the only way he could possibly have acquired the footage he needed to create this infringing video in the first place is is if he used third party software to download it. However, that is a violation of Plaintiff's copyright in and of itself, just like how it is a violation of copyright to use a torrent client to download a movie or video game without paying for it. That is why Plaintiff is suing for two counts of copyright infringement; one for illegally downloading the footage he needed to make the 50-second video in the first place, and another for using that illegally-acquired footage to make the 50-second video.

19.     Anyway, when a person uploads a video to Youtube, they have the option of giving the video a "description," which is displayed below the video. In the aforementioned video uploaded by the Defendant, his description stated, in pertinent part, the following:

> "This is a parody. (obviously)
>
> Fair Use Disclaimer:
>
> – Copyright Disclaimer under Section 107 of the Copyright Act of 1976, allowance is made for 'fair use' for purposes such as criticism, comment, news reporting, teaching, scholarship, education and research.
>
> – Fair use is a use permitted by copyright statute that might otherwise be infringing."

20.     This video contained the only interesting part about Plaintiff's accidental livestream, and contained the entirety of that only interesting part. As such, this video almost completely usurps the market for Plaintiff's own accidental livestream. The existence of this video means that people are unlikely to pay Plaintiff the $20 per month fee to see the livestream and strange noises the legitimate way. Why would they, when they can get the same thing from another Youtube channel for free?

21.     Plaintiff promptly proceeded to file a DMCA Takedown Notice with Youtube, claiming that this video infringed on his copyright. Youtube took the video down approximately one hour after the Takedown was filed.

22.     On May 25, 2021, Plaintiff received an email from Youtube claiming that Defendant had issued a DMCA Counter-Notice. In this Counter-Notice, Defendant stated, in pertinent part, the following:

> "I've created the video as a parody of it's original content which was a 2 hour

livestream, this parody is meant to be a meme and nothing like Acerthorns[1] original content. This is Fair Use as his material has been altered to create new content and has also not been monetized."

23.     He also consented in writing to the personal jurisdiction of this court, as Plaintiff has already mentioned.

24.     That occurred on May 25, 2021, so Plaintiff has until June 8, 2021 to file a lawsuit against Mr. Polano, otherwise the video automatically will get reinstated to Youtube. To prevent this from happening and to comply with this very narrow time frame, Plaintiff is filing this Complaint pro se and will continue to search for an attorney to represent Plaintiff while the case is pending (and hopefully before the Defendant even gets served with process, since Plaintiff will have longer than normal to serve the Defendant with process since the Defendant is in another country; see Fed.R.Civ.P. 4(m)).

## DISCUSSION AND APPLICABLE LAW

25.     The Defendant has infringed on Plaintiff's copyright. Of that, there can be no question. No reasonable finder of fact could possibly allege that the essential elements of prima facie copyright infringement are not present. Therefore, the ultimate outcome of this case turns on whether or not the Defendant can successfully claim fair use.

26.     First, however, it is important to point out that his claim of fair use is only even arguably applicable to the Plaintiff's *second* count of copyright infringement, which is his publication of 50-second-long video on his own Youtube channel. The first count of copyright infringement – illegally downloading the accidental livestream in the first place – is not the kind of infringement that could even arguably be considered fair use. Plaintiff also believes his entitlement to judgment on the merits in regards to the intentional infliction of emotional distress is also self-explanatory at this point. While the scope of damages may be disputed, if the allegations made in ¶¶ 11-15 are proven to be true, then Plaintiff would absolutely be entitled to, at the very least, prospective injunctive relief for harassment, and he should not even have to provide copious amounts of case law citation to establish that.

27.     But even on the second count of copyright infringement, the Defendant's claim of fair use is not only false, but patently frivolous. It is so frivolous, in fact, that it constitutes a violation of 17 USC §512(f)(2), which holds that "[a]ny person who knowingly materially misrepresents under this section that material or activity was removed or disabled by mistake or misidentification shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner."

28.     First of all, because the Defendant has engaged in a consistent pattern of harassment and doxxing against Plaintiff, any reasonable person could assume that the second count of copyright infringement was similarly designed, not to criticize the Plaintiff's work, but just to harass him.

---

1   Just to remind the Court: "Acerthorn" is Plaintiff's online username.

See Fed.R.Evid 404(b)(2) (evidence of other actions by a party is admissible to prove intent and motive behind current acts). Plaintiff urges that any infringement designed primarily to harass and/or dox the copyright holder should automatically not be considered fair use, even if that same video might be considered fair use in otherwise identical circumstances, as a contrary holding would be wholly at odds with the ends of copyright law.

29. Second, because the Defendant necessarily obtained the raw footage illegally, the video he created using that footage should automatically be precluded from being considered fair use, even if that same video could be considered fair use in otherwise identical circumstances. Fair use should be applied to the extent it advances the interests of copyright law. Allowing a copyright thief to claim fair use when he literally violated copyright law to get there is the complete opposite of that. Surely, the court has heard of the criminal law doctrine "fruit of the poisonous tree," whereby evidence that is only discovered thanks to other evidence that was itself acquired in violation of the citizen's Fourth Amendment rights will likewise become just as inadmissible as if it were a Fourth Amendment violation in its own right? Well, Plaintiff urges for a similar doctrine to be applied to fair use law. To hold otherwise would be like if a debtor could legitimately pay off a loan to a bank using money he acquired by robbing that very same bank.

30. But even barring all of that, even if we are forced to address the Defendant's claim of fair use on its own merit, his claim of fair use still fails, and it fails miserably. He may provide a more nuanced case for fair use once he finally obtains counsel in this case, but so far, the Defendant's entire case for fair use begins and ends with "It is fair use because it is a parody." Apparently, the Defendant believes that, as long as he says the words "parody" and "fair use," he is immune from copyright infringement liability. Apparently, the Defendant believes that the mere fact that he *says* it is fair use automatically causes it to become true.

31. Even if his video could be considered parody by the Court (as opposed to the Defendant), he appears to believe that, as long as it is classified as a parody, it is automatically fair use to the exclusion of all other factors. Put simply, that is not how this works. In fact, the Supreme Court has explicitly and unequivocally rejected the idea that parody is automatically – or even presumptively – fair use:

> "The fact that parody can claim legitimacy for some appropriation does not … tell either parodist or judge much about where to draw the line. Like a book review quoting the copyrighted material criticized, parody may or may not be fair use, and petitioners' suggestion that any parodic use is presumptively fair has no more justification in law or fact than the equally hopeful claim that any use for news reporting should be presumed fair. The [Copyright] Act has no hint of an evidentiary preference for parodists over their victims, and no workable presumption for parody could take account of the fact that parody often shades into satire when society is lampooned through its creative artifacts, or that a work may contain both parodic and nonparodic elements. Accordingly, parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." See Campbell v. Acuff-Rose

Music, Inc., 510 US 569, 581 (1994) (citations omitted).

32. In addition, the Defendant's DMCA Counter-Notice only further highlights his (potentially willful) ignorance of how fair use actually works. In his very short response mentioned in ¶ 22 of this Complaint, he stated that his video was three things at once: A parody, a meme, and an original work. Those three things are not compatible with one another.

33. Even ignoring that, the Defendant still contradicts himself. First, he says that his video was a parody. Then, literally one sentence later, he says that his video is not like Plaintiff's original content. However, if it is not like Plaintiff's content, then it is not a parody. The Supreme Court has held that "[p]arody needs to mimic an original to make its point." See Campbell v. Acuff-Rose Music, Inc., 510 US 569, 580-81 (1994). Therefore, if it is not like the Plaintiff's content, then it cannot be a parody. More to the point, if his resulting video is not like Plaintiff's original content, then that begs the question … how can the Defendant possibly be commenting on or criticizing Plaintiff's content?

34. That transitions to the next point: The Defendant has not even *attempted* any sort of transformative effect in his work. He bookends the clip from Plaintiff's accidental livestream with some clips from a gum commercial, but other than that, he just copies from Plaintiff's livestream verbatim with absolutely no alterations. There is no commentary, no criticism, no analysis, no evaluation, nothing that could even arguably be considered transformative whatsoever. The addition of the gum commercial clips is a completely superfluous addition that provides absolutely no commentary on Plaintiff's livestream clip. Even if the Court were to determine that the gum commercial clips provided some *de minimus* transformative value, the value added would be so minimal that it alone should not be able to overcome the other factors of fair use.

35. The second factor of fair use also weighs against the Defendant. While it is true that facts are given less copyright protection than fiction, and the fact that the accidental livestream showed a day in Plaintiff's life (which could be considered nonfiction), it is important to note that, when lawmakers and copyright law scholars say "facts," they typically mean things such as history, science, or politics, aka things of public importance. Simply peaking into one person's personal life on some random day, when he is alone in his own home, minding his own business and hurting no one, is, quite simply, not consistent with the public policy interests fair use was designed to protect. By contrast, it absolutely serves the Defendant's personal agenda of harassing and doxxing Plaintiff, but such malevolent motives, at best, do not help Defendant in his case for fair use, and at worst, actively hinder his case for fair use (see ¶ 28).

36. The third factor of fair use is neutral at best and weighs against the Defendant at worst. While it is true that Defendant's video was only 50 seconds long whereas Plaintiff's accidental livestream was nearly 2 hours long, Defendant used the most substantial portion of Plaintiff's accidental livestream. He used the "heart" of the accidental livestream (see ¶ 8), and therefore, this factor should be construed in Defendant's disfavor.

37. The fourth and final fair use factor – effect on the potential market – is egregiously and laughably in the Defendant's disfavor. The second count of copyright infringement contained the only interesting part about Plaintiff's accidental livestream, and contained the entirety of that only interesting part. As such, this video almost completely usurps the market for Plaintiff's own accidental livestream. The existence of this video means that people are unlikely to pay Plaintiff the $20 per month fee to see the livestream and strange noises the legitimate way. Why would they, when they can get the same thing from another Youtube channel for free?

38. In fact, not only does the Defendant's video usurp the market for Plaintiff's livestream, but that was almost certainly one of the Defendant's explicit goals. After all, as established ¶ 12, one of the Defendant's goals is to completely destroy Plaintiff's hopes and dreams of a full time career on Youtube and/or Twitch.

39. So in conclusion, the Defendant's case for fair use is patently frivolous, and Plaintiff's entitlement to judgment against the Defendant for copyright infringement is beyond clear. Fair use is supposed to be one of the most complex parts in all of American jurisprudence, but in the instant case, literally zero relevant factors of a fair use determination are in the Defendant's favor. Literally, the Defendant's entire case for fair use begins and ends with "It is fair use because I say it is." Even if the Defendant's attorney could come up with a stronger case for fair use on his client's behalf, the Defendant's attitude up to this point makes it clear that he did not create the 50-second video with the *real* law of fair use in mind.

40. For all of these reasons and more, not only should the Defendant be held fully liable for the second count of copyright infringement, but he should also be held liable for violating 17 USC §512(f)(2) for his complete and utter failure to consider fair use[2] when filing his counter-notice, instead substituting his delusional definition of fair use in place of the true law of the land. Not only that, but when the Defendant inevitably appears in this case, if he continues to advance his ludicrous claim that it is fair use simply because he says it is, he and his lawyer (if he has one) should be sanctioned by the Court for violating Fed.R.Civ.P. 11.

## RELIEF REQUESTED

41. Plaintiff requests the following relief from the Court:

42. First, Plaintiff seeks an injunction ordering the Defendant to

(a)   … cease and desist his infringing on Plaintiff's copyright.

(b)   … destroy or delete any content he has (on his computer or otherwise) that is copyrighted by Plaintiff, unless he can prove he acquired this content legitimately.

---

2   A party must consider fair use when issuing DMCA Takedowns and Counter-Notices. See Lenz v. Universal Music Corp., 801 F.3d 1126 (9th Cir. 2015), and their frivolous attempts to replace actual fair use law with their own delusional idea of what fair use is does not satisfy this requirement.

(c)   … to cease and desist harassing the Plaintiff and sharing via any of the Plaintiff's personal information that the Plaintiff does not willingly publish of his own accord.

(d)   … to no longer have any contact with Plaintiff unless it is supervised by American police or an American Court of competent jurisdiction.

(e)   … to no longer have any contact with any person who joins, follows, or subscribes to Plaintiff's Youtube channel, Discord server, or Twitch channel, unless that contact is entirely unrelated to Plaintiff or the contact is supervised by American police or an American court of competent jurisdiction.

43.   Plaintiff also requests damages in the following amounts:

(a)   $300,000 in statutory damages for the two counts of copyright infringement (because the infringements were committed willfully and maliciously, Plaintiff should receive the maximum statutory damages for each count).

(b)   Appropriate punitive damages up to $1,000,000 for intentional infliction of emotional distress and for violating 17 USC §512(f)(2).

44.   Plaintiff also requests any additional relief the Court believes the Plaintiff is entitled to.

## CONCLUSION

45.   In Conclusion, the Defendant has violated Plaintiff's rights (both his copyrights and his right to not be harassed), and the Defendant needs to be taught a lesson.

46.   Wherefore, premises considered, Plaintiff respectfully requests that the Court enter judgment in his favor, issue all injunctive and monetary relief requested in ¶¶ 41-44, award costs incurred (including any attorneys fees Plaintiff may incur in future), and any other relief to which Plaintiff may be entitled.

So requested on this, the 29th day of May, 2021.

_____
David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com