# REPORT ON INDIVIDUAL DEFENDANTS' HISTORY OF HARASSMENT, DOXXING, AND COPYRIGHT INFRINGEMENT

To the Counsel of all corporate defendants in Case 4:21-cv-04184-JSW Stebbins v. Polano,

1.      Here is the report, documenting most of the harassment, doxxing, and wanton copyright infringement committed against me by the individual defendants (Karl Polano, Raul Mateas, and Frederick Allison) in this case. This should hopefully persuade your respective clients to set into motion my proposal of locking the individual defendants' accounts, and giving them an ultimatum to voluntarily appear in the case within 30 days, otherwise their accounts will be permanently terminated, and they will not be able to create any more accounts after this.

2.      For Frederick Allison, I am aware of the possibility that it is actually his 16-year-old son Jonathan, rather than Frederick himself, who is the person who has actually been harassing and doxxing me these past few months. If it is indeed Jonathan, then I seek to hold Frederick vicariously liable for Jonathan's actions under the legal theory that parents are vicariously liable for the acts of their children, as long as those actions are willful and malicious. For the remainder of this report, I will refer to both people (Frederick and Jonathan alike) as "Mr. Allison," which could refer to either one.

3.      Please note that, even as extensive as this report is, it is still incomplete. While I will be providing screenshot and/or video proof of every piece of harassment, doxxing, and copyright infringement I have, there are some instances of harassment, doxxing, and copyright infringement that I forgot to take screenshots or video records of until it was too late. If this case goes to trial, I will provide oral testimony under oath as my main source of evidence for these things. In this report, instances of harassment or doxxing which I forgot to preserve evidence of will be clearly listed as such.

4.      Also, please note that I will be including a lot of harassment, doxxing, and ban evasions which have happened on Reddit as well, even though Reddit is not a party (nominal or otherwise) in this case. Since the individual defendants have not committed any *copyright infringement* against me (that I know of, at least) on Reddit, I have no basis with which to make Reddit even a nominal defendant under § 512(j). However, I still feel that their harassment, doxxing, ban evasions, and overall toxic behavior on Reddit is nonetheless relevant to helping you get the full picture in this case. So please keep that in mind.

5.      Last but not least, as you are now aware, Frederick Allison was served with process and

failed to appear in the case. He has now been entered in default, and it appears as if I will get a default judgment against him (unless he appears belatedly, in which case, you won't need to lock his accounts anyway). However, I am still including his behavior in this case for the same reason I am including the Reddit behavior: So you can get the full picture in this case.

6.      So with those things out of the way, let's get started.

## TABLE OF CONTENTS

| Section | Page |
|---|---|
| I.   INTRO | 1 |
| II.  TABLE OF CONTENTS | 3 |
| III. LIST OF EXHIBITS | 5 |
| IV.  INDIVIDUAL DEFENDANTS' ACCOUNTS | 6 |
| V.   SUMMARY OF ARGUMENT | 9 |
| VI.  FACTS | 11 |
| 1.   Identifies of the defendants. | 11 |
| 2.   Harassment | 13 |
| 3.   Hate Speech on the basis of real or perceived disability | 16 |
| 4.   Doxxing | 17 |
| 5.   Ban evasions | 18 |
| 6.   Repeats of copyright infringement | 20 |
| 7.   Desire to ruin my career on Youtube & Twitch entirely for its own sake | 21 |
| 8.   The individual defendants are incorrigible hypocrites. | 22 |
| VII.      ARGUMENTS | 25 |
| 1.   Unclean hands as a counter-defense to fair use | 25 |
| 2.   **Fair use: The four-factors test** | 28 |
| VIII.     MY PROPOSAL | x |

IX. POTENTIAL MONKEY-WRENCH:                    x
    USAGE OF VPN TO
    EVADE AN IP BAN

   1.  Case law on the issue                   x

   2.  Work-Around #1: Stopper Apps            x

   3.  Work-Around #2: VPN                     x
      Restrictions With Address-Verification

   4.  Work-Around #3: Injunctions            x
      via Litigation and/or Arbitration

X.  CONCLUSION                                   x

## LIST OF EXHIBITS

7.       To download the exhibits, go to
https://drive.google.com/file/d/1FCNAcefc0mdtnCYYbqgqzyQnxb1ZwJaN/view?usp=sharing.
Three of the exhibits (28, 48, and 65) are not the actual exhibits themselves, but are instead links
to unlisted Youtube videos. I had to do it that way because, if I had included the videos
themselves, I would have exceeded my allotted 15GB of Google Drive storage.

8.       For a brief description of what exactly these exhibits entail, please also see the attached
"Exhibit List." It is eleven pages long. I tried to list these exhibits in chronological order, but
after a while, I realized there were some exhibits that I needed to include, and I decided that
simply adding them at the end is better than going in and re-numbering every exhibit. I hope you
can accept the lack of order in these exhibits.

## INDIVIDUAL DEFENDANTS' ACCOUNTS

9.      These are the accounts for the individual defendants on all the websites they have harassed, doxxed, or otherwise violated my rights. This includes the websites of all the corporate defendants (including Facebook), but also includes Reddit. See the "intro" section of this report for reasons why Reddit is being included. Please also note that these are only the accounts which I know for a fact belong to these individual defendants. There may very well be others besides these.

10.     For Karl Polano, his known accounts are as follows:

   (a)     Youtube:
   •     http://www.youtube.com/sofiannp

   (b)     Discord:
   •     sofiannp#1337

   (c)     Twitch:
   •     http://www.twitch.tv/sofiannp

   (d)     Reddit:
   •     http://www.reddit.com/u/someguyfromlossantos

   (e)     Facebook:
   •     https://www.facebook.com/sofiann.polano

   (f)     Instagram:
   •     https://www.instagram.com/sofiannpolano/

11.     For Raul Mateas, his known accounts are as follows:

   (a) Youtube:
   •     http://www.youtube.com/tgp482

   (b) Discord:
   •      Deleted User a874fcf1#7412
   •     tgp482#2622

   (c) Twitch:
   •     http://www.twitch.tv/tgp482

   (d) Reddit:
   •     http://www.reddit.com/u/tgp482 (currently suspended for reasons unrelated to me)

12.     Mr. Allison has, hands down, created the most accounts on multiple websites. He is easiest the worst offender of the "ban evasions" transgression of all the individual defendants. Because a lot of his accounts have been deleted or banned, I will only provide the accounts that I know for a fact are still active, otherwise this list will be about 16 pages long. His accounts which meet this criteria are as follows:

(a) Youtube:
- https://www.youtube.com/channel/UC0J2MbjZk7dhLW2H4txk33g/
- https://www.youtube.com/channel/UCaHfclCVGFwGKcnHVhFRCEA/
- https://www.youtube.com/channel/UCNLQUU8C-QoQluPU1gbhE5A/
- https://www.youtube.com/channel/UCTQEzJsdMd9Fr-M1Il1Ajvw/
- https://www.youtube.com/channel/UCpHo3XvWhNIAGJl1uMoFfHw/
- https://www.youtube.com/channel/UCYyNjDmLKroeGj3W043bOfw/
- https://www.youtube.com/channel/UCXVDSpssOSuGV3O-U0DenVw

(b) Discord:
- VoreNeko777#4172
- Conner#8495
- Cutiekittycat#0500
- Sapapa#8070
- Henry Carelsen#3086
- [username changed]#2601
- jackgg#6503
- Clarple#6891

(c) Twitch:
- http://www.twitch.tv/maltye                    http://www.twitch.tv/waaaaaaalt
- http://www.twitch.tv/stebbins                  http://www.twitch.tv/manamanmark
- http://www.twitch.tv/fchusaj12392              http://www.twitch.tv/gpdizzle777
- http://www.twitch.tv/qfumarola147              http://www.twitch.tv/vofcr4c9bz68
- http://www.twitch.tv/psquadron2292             http://www.twitch.tv/qomateus1035
- http://www.twitch.tv/nyfcr4c9bz68              http://www.twitch.tv/davidstebbins
- http://www.twitch.tv/yea405                    http://www.twitch.tv/jimbo3524
- http://www.twitch.tv/nullll44                  http://www.twitch.tv/davidstebbins69
- http://www.twitch.tv/davidstebbinsinsaneliar
- http://www.twitch.tv/davidstebbinsisfat        http://www.twitch.tv/davidstebbins353
- http://www.twitch.tv/davidstebbins35554        http://www.twitch.tv/davidstebbins353356
- http://www.twitch.tv/fattystebbins             http://www.twitch.tv/cartmasterjames
- http://www.twitch.tv/davidstebbinsloseweight
- http://www.twitch.tv/da_dawg_                  http://www.twitch.tv/apchetet
- http://www.twitch.tv/llliiiilllix              http://www.twitch.tv/jejejejewf
- http://www.twitch.tv/eye2wy                    http://www.twitch.tv/rherjh
- http://www.twitch.tv/initiativekookie24        http://www.twitch.tv/jamesbond3636

Stebbins v. Polano - Report on Individual Defendants' Harassment          Page 8 of 45

- http://www.twitch.tv/wegehe353          http://www.twitch.tv/egew3hwe4h43
- http://www.twitch.tv/jayswingler235          http://www.twitch.tv/g3ew3t
- http://www.twitch.tv/egwyt4y          http://www.twitch.tv/eg3w4e634
- http://www.twitch.tv/et3t3yrge          http://www.twitch.tv/jasonbourne252
- http://www.twitch.tv/davidmoana          http://www.twitch.tv/sukmabulz556
- http://www.twitch.tv/svdvdvdvdvdvdvdv          http://www.twitch.tv/jakeconway232
- http://www.twitch.tv/hswhhh          http://www.twitch.tv/mrbean14142
- http://www.twitch.tv/drno1434          http://www.twitch.tv/blackman2r2f
- http://www.twitch.tv/hafed242          http://www.twitch.tv/davidstebbins242r
- http://www.twitch.tv/initiativekookie242          http://www.twitch.tv/negan1242
- http://www.twitch.tv/minecraftlegend1467          http://www.twitch.tv/conormcgregor2525
- http://www.twitch.tv/conormcgregor22526          ttp://www.twitch.tv/jaynorton14
- http://www.twitch.tv/theriddler315          https://www.twitch.tv/shadowshot888

(d) Reddit[1]:
- https://www.reddit.com/user/NefariousnessLow4688
- https://www.reddit.com/user/OptimalBag3832
- https://www.reddit.com/user/TheRiddler315
- https://www.reddit.com/user/InitiativeKookie1415

(e) Facebook:
- https://www.facebook.com/frederick.allisonjr

---

1  Please remember that these are just the profiles that (A) I know about, and (B) are still active. Reddit is usually pretty good about suspending accounts when I report them. If only they were as good at *keeping* him out of the site as they were in issuing the suspensions in the first instance, then we'd be set.

## SUMMARY OF ARGUMENT

13.     The individual defendants have engaged in a months-long campaign of hate, harassment, hate speech, and doxxing against me, across multiple websites, including but not limited to the websites of the corporate defendants in this case. Just on this alone, the corporate defendants would be more than justified in the court of public opinion in banning the individual defendants' accounts and preventing them from ever creating any new accounts ever again.

14.     As for the copyright infringement, the individual defendants have acted with such bad faith and malice in their reproduction of my copyrighted content that I believe I can easily have the court declare that the individual defendants have acted with unclean hands, which can serve as a counter-defense to their expected defense of fair use. This means that their videos and other infringements are automatically not considered fair use, even if those same videos could be considered fair use by otherwise identical circumstances.

15.     I have three separate grounds for claiming that their fair use defense is barred by the counter-defense of unclean hands. First, they acquired the raw footage by illegally downloading it (which also forms the basis of my first count of copyright infringement); if they had not committed that first count of infringement, they never would have been *able* to commit any of the other ones. Second, the only reason they were committing these infringements was to harass and dox me, rather than criticize my work for its own sake. Third, almost all of these infringements were uploaded and taken down before, but rather than file a DMCA Counter-Notification the first time, they instead proceeded to re-upload the infringements or get another one of the individual defendants to upload it on their behalf. Because they tried to give me the run-around and only resorted to the "proper channels" as a last resort, they should lose the right to invoke the "proper channels." Admittedly, this third one is more laches than unclean hands, but the important thing is that it is a counter-defense to fair use.

16.     Even if we must consider fair use on its own terms, the individual defendants have failed on almost every factor of fair use. Their uses are egregiously non-transformative. Many of the earlier infringements were done before the accidental stream was even published.[2] They almost all use the "heart" of the work, and not only are these infringements highly likely to usurp the market for the original, but the individual defendants, by their own admission, are acting with the express intent to prevent me from earning any money from this accidental stream.

17.     For these reasons, I believe I have a very strong chance of winning this case. However, because two of the three individual defendants are in other countries, I must go through the Hague Convention to serve them with process. This will take ages. If, however, the individual defendants were to *voluntarily* make appearances in this case, we could proceed with the merits of the case much sooner than we otherwise could. The corporate defendants have an incentive to encourage the individual defendants to make this voluntary appearance, since every day the case sits open but dormant still costs the nominal defendants *some* attorneys fees. These fees are negligible for a case against domestic defendants, but even negligible costs can add up over the

---

2   Because the original broadcast was an accident, I believe it should be treated as a leak, rather than a publication, for purposes of copyright law.

course of months or years. Therefore, it is still in the corporate defendants' best interests to cooperate with my plan.

18.      I propose that the corporate defendants proceed to lock the individual defendants' accounts. When the individual defendants log into their accounts, they cannot see or do anything on the accounts, except read a message explaining why their accounts are locked. This message will demand that they make voluntary appearances in this case, threatening to permanently terminate their accounts within 30 days if they do not voluntarily appear.

19.      The individual defendants may attempt to circumvent these bans by using VPNs to hide their IP addresses, enabling them to create new accounts under the guise of new people. However, I believe there are steps that the corporate defendants can reasonably take to significantly lessen the likelihood that they will be able to successfully circumvent bans this way. At first glance, some of these steps may seem less reasonable than others, but please understand that the DMCA requires you to do whatever is reasonable to keep people from rejoining after a DMCA-mandated termination. I am asking for nothing more than what I would be entitled to under § 512 if I were to prevail on the merits.

## FACTS

20.     These facts are necessary to understand the case at hand.

### Identities of the Defendants

21.     First, we should make sure we know who the guilty parties are. This is especially an important topic in the case of Mr. Allison, since he has made it clear that he plans to contest that he is the one who has created the numerous "InitiativeKookie" accounts. See **Exhibit 62**, **Exhibit 63**, and **Exhibit 103** (timestamp 4:10 – 5:07). So I believe I should first take a minute to establish what proof I have that the individual defendants are indeed properly named.

22.     Karl Polano is the one who has done the least to hide his identity. He has filed not one, but two DMCA Counter-Notifications, and has given the same name and address both times. See **Exhibits 94 & 95**. I know that Raul Mateas is TGP482 because he issued a DMCA Counter-Notification, giving his email address of raulmateas20@gmail.com. See **Exhibit 96**. When I contacted him over that email address to attempt to settle that matter out of court, he replied and signed his email by saying "sincerely, TGP482." Therefore, I can safely say that Raul Mateas is the correct name of the person who was previously listed as "John Doe #2."

23.     For Mr. Allison (formerly known as "John Doe #1, d.b.a. InitiativeKookie"), it's a bit more complicated. I eventually found out who he was by giving him a taste of his own medicine. On August 20, 2021, I created a throw-away, under-cover account called SomeoneElse#4409 so I could hopefully lull him into a false sense of security and get him to spill the beans. This worked, and he immediately reached out to me, thinking that he was doxxing me to another user. He did so using the Discord account of T.K Baha [HM]#8421, which had the same primary name as T.K Baha [HM]#6503. I already know that T.K Bah [HM]#6503 is Mr. Allison, so I was able to put two and two together.

24.     My conclusion rests on three premises:

- Premise #1: The Discord account of T.K Baha [HM]#8421 is owned by InitiativeKookie.

- Premise #2: The Discord account formerly known as T.K Baha [HM]#6503 and now known as jackgg#6503 is owned by Mr. Allison.

- Premise #3: The two aforementioned T.K Baha [HM] accounts are both owned by the same person.

- Conclusion: Mr. Allison is InitiativeKookie, formerly known as John Doe #1 in this case.

25.     If all three of those premises are true, then the conclusion is also true. So let's take a look at each premise one at a time, and see if we can safely decide that these are all true.

Premise #1: The Discord account of T.K Baha [HM]#8421 is owned by InitiativeKookie.

26.     This is the easiest to prove. Not only does he confess to being InitiativeKookie in the original discord message (see **Exhibit 101**), but he even contacts me on Reddit the next day and makes it clear that it is him. See **Exhibit 59**. So Premise #1 is handily proven.

Premise #2: The Discord account formerly known as T.K Baha [HM]#6503 and now known as jackgg#6503 is owned by Mr. Allison.

27.     This is also a premise we can readily accept as true. Earlier in the year 2021, I hosted a monthly giveaway on my Youtube channel called the "Secret Joke Contest." For the month of March 2021, the winner of that giveaway was "Jonathan." See https://www.youtube.com/watch?v=64jw20NGeqg. I knew from prior conversations that "Jonathan" had commented on my videos under the Youtube username "Jonathan Allison," and had joined my Discord server as T.K Baha [HM]#6503, so I contacted him on Discord to request his name and address so I could send him a gift card that he won as his prize. He gave me the name and address of "Frederick Allison, 2057 Knob Ln, Hiawassee, GA 30546." See **Exhibit 103** (timestamp 0:29 – 1:00).

28.     In this instance, he has a vested interest in giving me accurate information, since (A) I don't yet know that he's really InitiativeKookie, and (B) he obviously wants his prize, right?

29.     But even if that isn't good enough for you to accept that he is telling the truth, there's also the fact that, when I found out that he was InitiativeKookie, I conducted a profile search of Frederick Allison on the website of beenverified.com. See **Exhibit 99**. This profile confirms that Mr. Allison does indeed live at the aforementioned address, and also that his primary email address is fallison9209@gmail.com. Why is this important? Well, cross-reference that with **Exhibit 98**, where I show you the entry form that Mr. Allison submitted that ultimately caused him to win his prize. In that contest entry form, he gave the email address of jonathana9209@gmail.com. In one, Frederick used his first initial and last name. In the other, Mr. Allison uses his (either fake or real) first name followed by his last initial. But in both cases, Mr. Allison's name is followed up by the number 9209. Why that specific number? It's clear that Mr. Allison sees some personal significance in that number.

30.     So either (A) Jonathan is following in his parents' footsteps by using the "family number" when creating his personal email address, or (B) Frederick created a throw-away email address and used a similar naming scheme to his real one so he could more easily remember it.

31.     Either way, the odds are overwhelmingly likely that Mr. Allison is the person/household I was speaking to on Discord that fateful day.

Premise #3: The two aforementioned T.K Baha [HM] accounts are both owned by the same person.

32.     This is the big one. This is the one that Mr. Allison is most likely to fiercely contest when he appears in this case. Sure, InitiativeKookie *claims* to be the same guy as T.K Baha

[HM]#6503, but how do we know that's not just him trying to drive a wedge between me and a loyal fan, and/or send me on a wild goose chase to *think* I've got him when really I'm suing an innocent bystander (like he claims to have done in **Exhibits 62 & 63**)?

33.     The answer is simple: Because in order to do that, he would have to have known that he was talking to me. But while he did figure that out eventually (see at the end of **Exhibit 101**, when he suspects that I might be Acerthorn), he couldn't possibly have known that at the start of the conversation. I also cannot conceive any *other* motive that InitiativeKookie could possibly have to impersonate T.K Baha [HM]#6503 other than to make me (and specifically me) think they are the same person.

34.     Let's also not forget that, when I suggested to Mr. Allison the prospect that he provide digital forensics evidence to exonerate himself (see **Exhibit 103**, timestamp 4:30), he replies with cuss words and declarations that I've "lost a subscriber" (the implication being that I'm the one who burned that bridge, rather than him). When I accuse him of being a long-time troll, and the most offensive thing I say is when I give him a way out and a way to absolve him of suspicion, that's very telling.

35.     Then, he goes on to confess to numerous lies he has told me, like how he lied about being on vacation, instead claiming that he just stopped watching. See **Exhibit 103**, timestamp 4:34. At timestamp 4:54, he also apologizes for lying. At 4:55, he admits to lying about his age, and even who he was. At 5:00, I told him that I was contacting Frederick Allison on facebook to try and sort this out[3]. Mr. Allison told me that I contacted the wrong Frederick … *before he even knew exactly which Frederick I contacted*! As if that wasn't suspicious enough, let's also not forget that the town he is in - Hiawassee, Georgia – has a population of less than 1,000 people as of the 2020 Census[4]. You're honestly telling me that there are multiple people named Frederick Allison in that little village?!

36.     So because this person is clearly proven to be (and even confessed to be) a bald-faced liar, we shouldn't believe *anything* he tells us unless it comes from a disinterested source (such as the digital forensics I suggested to him).

37.     The contents of **Exhibits 62 & 63** do not change this. Unlike at the start of **Exhibit 101**, this time around, he knows that I am Acerthorn, and he knows that I'm onto him. At this point, he has every incentive in the world to try and throw me off the trail. Of course he's going to plant some fake bread crumbs at that point.

### Harassment

38.     This, I hope, will be much easier to prove than the fact that Mr. Allison is InitiativeKookie. Hopefully, this should be just as easy as proving that Karl Polano is SofiannP. Hopefully, I can just tell you which exhibits to look at, and then the exhibits should speak for

---

3   For the record, Frederick, to this day, has not responded to my correspondence on Facebook.
4   See https://www.census.gov/programs-surveys/popest/technical-documentation/research/evaluation-estimates/2020-evaluation-estimates/2010s-cities-and-towns-total.html

themselves.

39.     This all started on February 27, 2021, when I posted a community post on Youtube, wondering if people were intentionally trying to sabotage my channel with low-retention views. See **Exhibit 01**. Mr. Allison – perhaps drawn by the aroma of low-hanging fruit – took credit for this. See **Exhibit 02**. If Allison's actions had ended there, I would not have taken significant action. I have dealt with trolls before. I usually just block them and move on with life. However, on March 1, 2021, Allison also contacted me on Reddit. I had posted a question about about starting a livestream channel on Twitch, and I wanted to know how to use a certain feature of my streaming software. On March 1, 2021, Allison – acting under the alias InitiativeKookie7767 – posted in that thread, stating "idk but your videos are pretty shitty lol, hope you're enjoying the death of your channel." See **Exhibit 03**.

40.     Again, this alone would not have been a big deal. Under normal circumstances, I would have simply blocked him, reported him to the Reddit moderators and administrators for a potential ban from the site, and then moved on. The problem here is that he is harassing me across multiple websites. It isn't enough that he makes it known that he does not enjoy my content and believes that I am a terrible YouTuber. He is monitoring my social media presence like a vulture, looking for any opportunity he can find to swoop in and harass me.

41.     On March 2, 2021, Allison posted not one, but two videos to his own YouTube account. See **Exhibits 04 & 05**. One of them was called "RIP Acerthorn (2018-2021)." The other was called "Acerthorn EXPOSED as being … pretentious!" Both videos used content from my YouTube channel, and so I issued DMCA Takedowns on them.

42.     On March 14, 2021, Allison deleted his accounts on YouTube and Reddit and replaced them with accounts going by the aliases PatientPea9364, PatientPea42, and Patient-Pea2495. See **Exhibits 06-12**. In these accounts, he stated that he was InitiativeKookie under a new name, and that any time I reported him to any mods or issued any DMCA Takedowns against him, he would simply create a new account to get around any bans or blocks. He also reposted the video "RIP Acerthorn (2018-2021)" and contacted me on Reddit to give me a link to that video. In other words, it was not enough that he simply was harassing me. He wanted me to know that he was harassing me. The administrators of Reddit eventually swooped in and issued a sanction against PatientPea, but he merely deleted that account and created a new one, also called PatientPea but with a new number at the end. He then contacted me using Reddit's "private chat" function and proceeded to level various cussfilled insults at me. This continued for several weeks, with me reporting him to the Reddit administrators, him getting sanctioned, him deleting the account, creating a new account under a different name, and then proceeding to harass me again. And again. And again. This pattern continued for several weeks. See **Exhibits 06-12**.

43.     On March 18, 2021, Allison, acting under the psuedonym "InitiativeKookie," joined my Discord server. His first message said "brought you a present." See **Exhibit 13**. This "present" was in fact a slew of unsolicited pornographic images. I believe this should constitute sexual harassment. Perhaps the most shocking and appalling of these images was an image of a man attempting to cut his own penis off with a steak knife. See **Exhibit 14**.

44.     In late March of 2021, Allison created a new Discord account with a different name that I did not recognize. He spent several weeks in my Discord, being civil and courteous, and participating in chat in a non-disruptive manner. On or around April 13, 2021, he asked to be a moderator for my Discord server. I questioned him about the job and he gave exemplary responses to the interview, so I appointed him to the position. I woke up the next day (April 14, 2021) to find nearly everyone banned from my Discord server, and with the new moderator having changed his name to InitiativeKookie in order to show his true colors. This is one of the few times I forgot to take screenshot or video proof before I deleted it, so if the case goes to trial, I will have to rely on oral testimony and my own personal knowledge.

45.     On March 24, 2021, I received a message from Polano on Reddit, under the username "someguyfromlossantos." In it, he threatened to make my life a descent into hell if I did not abandon my aspirations for a full-time career on Youtube and Twitch. See **Exhibit 15**. Now, I know what you're thinking: All he says is that my life will become a descent into hell, not that he, personally, will cause it to become so. If this were the only message he had ever sent to me, I might be inclined to agree. However, fast forward a few months, and the only "hell" my life has "descended into" is the "hell" that he and the other individual defendants are personally and directly causing. With the benefit of hindsight, his "warning" is clearly meant to be interpreted as a threat. Meanwhile, Mr. Allison continued to harass me on Reddit, Youtube, Discord, and Vimeo under various usernames. See **Exhibits 16-27**.

46.     On April 18, 2021, Polano tricked me into doing a collab stream with him on Steam in the hopes of getting more viewers by tapping into his established fanbase. This ended up being a trick, since he proceeded to dox me at the end of the stream. See **Exhibit 28**. After a few days, I found out that Polano's Discord server (known as "Great Six") was sharing my copyrighted content without my permission, as well as harassing and doxxing me. So I headed over there to see if I could get it taken down. The level of vulgarity, toxicity, profanity, and sheer hatred that I got instead has to be seen to be believed. See **Exhibit 29**.

47.     On April 26, 2021, Polano did his own stream called "Acerthorn Exposed[5]," where he proceeded to dox me further. I and another Discord/Youtube user both reported this stream for doxxing, and it was taken down later that same day for a community guidelines violation. See **Exhibits 30-33**.

48.     The harassment and doxxing continued on Reddit and Discord (both on my server and the Great Six server) for quite some time. See **Exhibits 34-38**. Eventually, Polano escalated the matter by posting one of their infringing material onto Youtube. See **Exhibit 39**. I had this taken down via the DMCA too, but this time, he issued a DMCA Counter-Notification, forcing me to file suit. See **Exhibit 94**. While his Counter-Notification was pending, members of the Great Six Discord server also conspired to retaliate against me for this takedown by having *my* channel taken down with bogus DMCA claims. See **Exhibit 40**. This collusion ultimately resulted in Mateas issuing a false DMCA Takedown against one of my videos. See **Exhibit 42**. He also harassed me by creating a troll entry on Urban Dictionary, likening my online username to

---

5   While I forgot to take a screenshot of this, I can testify under oath that this stream was called "Acerthorn Exposed."

frivolous litigation. See **Exhibit 41**. Because I managed to become a Twitch Affiliate despite their best efforts to sabotage my career, Polano contacted me on Reddit and threw a tantrum because I didn't do things the way he thinks are ethical (as if he's a beacon of morality and ethics himself). See **Exhibit 43**. He was eventually sanctioned by Reddit for this outburst. See **Exhibit 44**.

49.      Then Allison tried to infect me with a computer virus. See **Exhibit 45**. Meanwhile, the harassment and doxxing from the individual defendants continued, on Instagram, on Discord, on Reddit, on Youtube, on Twitch, and even over email. See **Exhibits 47-85**. They even DDOS'd one of my streams at one point. See **Exhibit 83**. They just won't stop!

### Hate speech on the basis of real or perceived disability

50.      In addition to being "harassment," a lot of what the individual defendants have done can also be classified as "hate speech" on the basis of real or perceived disability. See …

- **Exhibit 29** ("I'm losing my patience with your single digit 'murican fucking brain");

- **Exhibit 49** ("Asperger's Retard demented piece of shit");

- **Exhibit 51** ("you demented fucking moron");

- **Exhibit 54** ("deranged fuck");

- **Exhibit 57** ("here is proof of this mentally insane person");

- **Exhibit 59** ("better make another one you retard");

- **Exhibit 62** ("you fucking moron");

- **Exhibit 65** – A stream from Karl Polano, originally streamed on August 26, 2021, where he plays as me, and has me escape from an asylumn, the implication being that this is an artistic re-enactment of something that Acerthorn (aka me) did in real life … get it?! *Because I'm deranged!!!!!*

- **Exhibit 67** ("you're such a moronic fucking manchild");

- **Exhibit 68** ("who's family abandoned him because of how mentally ill he is");

- **Exhibit 70** ("YOU RETARDED PIECE OF SHIT");

- **Exhibit 75**, Page 1 ("do you shit the bed?" "your pretty deranged ngl");

- **Exhibit 75**, Page 4 ("how many mental illnesses do you suffer from");

- **Exhibit 75**, Page 9 ("why is the bed wet? it's like you pissed on it");

- **Exhibit 76** ("everyone's gonna see how deranged you are");

- **Exhibit 81** ("you're obviously mentally ill" "you're just another deranged obese manchild" "it's all online even your psychiatric review" "We'll try to raise some money to offer you treatment");

- **Exhibit 83**, Page 3 ("ret@rd");

- **Exhibit 83**, Page 6 ("stop whispering to yourself like a lunatic");

- **Exhibit 83**, Page 7 ("which lunatic asylum did you escape from");

- **Exhibit 85** ("what are the symboms of Asperger Syndrome");

- **Exhibit 101**, Timestamp 0:03 ("And I'm pretty sure he suffers from aspergers and other mental issues").

51.     If that doesn't prove that the individual defendants are committing hate speech against me, then nobody can ever commit hate speech against anyone because the bar for "hate speech" is set far too high for anyone to ever achieve.

## Doxxing

52.     Twitch and Youtube both strictly prohibit doxxing. Their community guidelines are exceptionally clear on this.  Well, the individual defendants have also engaged in widespread doxxing.

- In **Exhibit 20**, I had one of his infringements taken down on Vimeo. Unlike Youtube, however, Vimeo publicly displayed my real name. In **Exhibit 26**, you can see that Allison used that information to find my location as well. The implication here is that he is going to start doxxing me very, very soon.

- See **Exhibit 28**. This is a collab stream I did with Karl Polano on April 18, 2021. He lured me into this video under false pretenses, but near the end of the stream, he removed his sheep's clothing and bore his wolf's fangs and teeth by doxxing me.

- In **Exhibit 29**, you can see that the entire Great Six Discord server has essentially researched my entire life history, because they say things like "Do you want me to call the University of Arkansas" (because I briefly attended college there) and various other things that they could only know about if they have spent the past few days doxxing me.

- See **Exhibits 30-33**, where Polano did a stream dedicated to doxxing me and got the

stream removed by Twitch as a punishment (see the section on "harassment" for more details.

- **Exhibit 37** – Polano sends a DM (direct message) to one of my Discord members, doxxing me.

- **Exhibit 45** – A message from another Discord user who explains that the Great Six Discord server was monitoring my Discord server like a vulture looking for new members who they can dox me to.

- **Exhibit 48** – A video of a livestream originally streamed by Polano where he spent thee solid hours doing nothing but harassing and doxxing me.

- **Exhibit 50** – A user on Discord (most likely Raul Mateas) who has created an account with my IP address as his username, and admitting that his purpose is to troll and dox me with this account. This conversation happened on July 22, 2021.

- **Exhibit 51** – While not an act of doxxing in and of itself, it contains a vow that he will continue to dox and "expose" me forever, "and there's fuck all [I] can do about it."

- **Exhibit 66** – Posting a Youtube video under the guise of my real name.

- **Exhibit 68** – Creating a Reddit account using my real name.

- **Exhibit 69** – Creating *another* Reddit account using my real name, but changing the last "S" in my last name to a "Z."

- **Exhibit 75**, Pages 2-3 – Addressing me by my real name in an attempt to publicly reveal to other viewers what my real name is.

- **Exhibit 81 – W**hile Polano has not yet doxxed me on Youtube, in this exhibit, he clearly expresses his intent to do in the near future, with such statements as "You do realize that I'm collecting evidence and soon will expose you on Youtube" and "It's all online even your psychiatric[6] review."

53.    Hopefully, your client has seen more than enough when it comes to doxxing. So let's move onto ...

### Ban Evasions

54.    Youtube and Twitch both strictly prohibit creating new accounts in order to get around being blocked or banned, either from individual channels or the entire site. Twitch is especially fierce about this, even going as far as to prohibit other accounts from featuring a suspeneded

---

6   As if my name and address wasn't bad enough, he's even digging into my *medical records* to dox me!

user! See https://www.twitch.tv/p/en/legal/community-guidelines/ ("In addition, it is prohibited to use your channel to knowingly feature or advertise a suspended user. We understand that there may be instances where suspended users may appear on your stream due to circumstances beyond your control, such as through third-party gaming tournaments, but we expect that you make a good faith effort to remove them from your broadcast, mute them, or otherwise limit their interactions with your stream").

55.    Also, I'd like to defer you to the arguments I made in ¶¶ 116-118 of my Second (and Third) Amended Complaints. Notice the parallels I make to trespassing in a brick & mortar business, and how, even if the behavior they exhibit while on the premises is not independently actionable as a crime or tort, their repeated unlawful entry into the premises still is. I believe that ban evasions should be treated the same way.

56.    To that effect, Allison is hands-down the worst offender of this. As you can see when you go through the list of exhibits, he has created dozens and dozens of accounts in order to get around me blocking him. The first time he did this was in early March, when he switched his primary youtube account from "InitiativeKookie" to "Patient-Pea9364" and his primary reddit account from "InitiativeKooky7767" to "Patient-Pea42." This was clearly done simply to get around me blocking him. But then, it go so much worse.

57.    **Exhibits 75 & 83** depict Allison creating multiple Twitch accounts in the course of approximately approximately two hours across two different days.  In **Exhibit 75,** pages 5 & 6, you can see that he got banned from one account (jamesbond3636) at 8:25PM, but was posting from a new account (wegehe353) at 8:28PM. In other words, he was able to create a new account to evade a ban *in just three minutes*!

58.    Then there are the numerous Reddit and Discord bans that the individual defendants have suffered. **Exhibits 11**, **12**, **21**, **44**, **58**, and **60** show Reddit not only taking disciplinary action against the individual defendants for harassing me, but also notifying me of this disciplinary action. Reddit has also suspended Allison's accounts numerous times with or without telling me about it, as you can see if you enter the url of http://www.reddit.com/u/[account name], replacing "account name" with the various accounts that Allison has used to harass me.

59.    Then there's the numerous Youtube channels that the individual defendants have used to evade copyright strikes on Youtube. "Spinning Monkeys," "Incognito Pelican," "Wei Lei Xiao Yung," "Sügmi Nuitz," "Yuki Yamazaki," and "Greg" are just a few throw-away channels that the individual defendants have set up so they can absorb copyright strikes without putting their primary channels in jeopardy. This may not be a "ban evasion" per se. But it is just as unscrupulous as a ban evasion, and it comes from the same malicious train of thought as ban evasions, so it still counts.

60.    So far, I have placed a great emphasis on Allison, but the other individual defendants share some blame in this, too. Polano has joined my second discord server (see **Exhibit 90**[7])

---

7   This shows that SofiannP was *banned* from my second Discord server, not that he *joined*. However, I cannot ban a user who hasn't already joined, so the fact that one has happened is proof that the other also happened.

despite having been banned from the first one. So he knows full well that he isn't welcome in my server anymore, but he decides to barge in anyway, simply because he doesn't give a fuck. Of course, let's also not forget that the only reason he was able to join in the first place is because they conspired to have one guy donate only $1 to me on Patreon, and then share the invite link so others could join without supporting me. See **Exhibits 91 & 92**.

61.     Then there is TGP482. While he has not, so far, committed any ban evasion *in order to harass me* (unless you count him creating the "Greg" throw-away Youtube channel in order to absorb a copyright strike), he has still committed ban evasions generally. His original Discord account was banned sometime in late August or early September 2021. Despite this, he has resurfaced under a new Discord account. See **Exhibits 86 & 87**.

62.     Even if the individual defendants believe that their original bans were unwarranted, they should have *appealed* their original bans, not simply created new accounts. Even if they felt that the ban was *illegal* (for example, if they felt the bans violated American, British, or Swiss discrimination laws), they should be required to pursue discrimination claims in court. Simply taking the matter into their own hands and conducting ban evasions should absolutely not be allowed.

63.     Overall, the ban evasions alone more than warrant the nominal defendants in this case to take nuclear action against the individual defendants, even if all the harassment, doxxing, and hate speech doesn't.

**Repeats of Copyright Infringement**

64.     Their repeated ban evasions are not the only thing they have done multiple times. Let's also talk about the tort that I am officially suing over in the first place: Copyright infringement. The individual defendants have engaged in at least sixteen different counts of copyright infringement, and that's just the counts I know about. See **Exhibits 05**, **09**, **18**, **19**, **20**, **22**, **24**, **27**, **34**, **35**, **39**, **57**, **65**, **66**, **77**, and **79**.

65.     Now, why is this so important to this report? This is meant to be a discussion of their history of harassment and doxxing. Copyright infringement is supposed to be litigated in court.

66.     Well, the answer to that is simple: You may notice that, although they have committed nearly two dozen counts of copyright infringement against me (and that's just counting the instances I know about), they have only ever issued three DMCA Counter-Notifications against me. See **Exhibits 94**, **95**, and **96**. For two of those counter-notifications, they were countering a takedown of videos that had been taken down before. **Exhibit 94** was meant to counter the takedown of **Exhibit 39**, but that video was just a re-upload of **Exhibits 22**, **23**, **24**, and **27**. Meanwhile, **Exhibit 96** is a counter-notification to **Exhibit 79**, but that video is only a re-upload of **Exhibit 77**! Meanwhile, on Discord, a user by the name of DeFranko has made it clear that the individual defendants will continue to repost the infringements again and again. See **Exhibit 36**.

67.     Now, why is *that* so important, you ask? Well, because this violates Youtube's terms of service, in and of itself. There is a Youtube channel run by social media lawyer "Ian Corzine." He has recently done a livestream where he explains 7 things that can get your Youtube channel deleted. You can find this stream at https://www.youtube.com/watch?v=uXp0O44uXJE. At timestamp 42:25 – 44:48, he addresses this kind of behavior. If a video gets taken down, nd the takedown is not contested, but instead the uploader decides to re-upload it just because they consider the "proper channels" to be too slow, expensive, or frustrating to deal with, then that alone is grounds for immediately termination.

68.     In addition to that, I also plan to argue that their failure to go through the proper channels should disqualify them from being allowed to claim fair use. But I'll save my reasons for that position for the "argument" section of this report. In the meantime, just know that their re-uploading of previously-stricken content without going through the proper channels first is a violation of Youtube's terms fo service and therefore grounds for account termination.

### Desire to ruin my career on Youtube & Twitch entirely for is own sake

69.     So all of this begs the question … why? Why would the Defendants go to such extreme lengths to do all of these things to me? What is their motive? Is it money? Is it revenge? If it's revenge, then what did I ever do to them? Why are they doing this? WHY?! WHY?! WHY?!!!!

70.     The answer is as simple as it is appalling. Their motive is … malice for its own sake. The individual defendants have made it abundantly clear that they seek to ruin my career on Twitch and Youtube, not for any personal gain, but simply because … they just want to. They have made it abundantly clear that they have no more nuanced of a motive than this.

71.     Karl Polano admits to having no greater motive than to ruin my career for its own sake. See **Exhibit 81** ("I'm collecting evidence and soon will expose you on Youtube ... When I post the video ... people will see you for who you are").

72.     Raul Mateas admits to having no greater motive than wanting to ruin my career for its own sake. See **Exhibit 82** ("I know the real reason why you removed it[8], it's because you'd lose any viewers you already have if people saw you for who you actually are").

73.     Mr. Allison has, on multiple occasions, made it clear that his only goal is to "kill" my channel. See **Exhibit 03** ("hope you're enjoying the death of your channel"); **Exhibit 06** ("good thing Patient Pea is here to continue killing your channel"); **Exhibit 17** ("it might just be me killing your channel"); **Exhibit 49** ("both your twitch and youtube channels are dead, its over i fucked you over too hard"); **Exhibit 53** ("i've already pretty much single handily destroyed your youtube channel with low retention views and watch time"); **Exhibit 74** ("every time yyou stream im gonna be making accounts one after the other till you end the stream"); **Exhibit 75, Page 8** ("how do you feel about your channel being dead because i killed it?"); **Exhibit 76** ("so much for having to pay lmaoo im gonna be spreading around this all over the place").

---

8   By accusing me of acting with this motive when removing the content, he is effectively admitting that this is his primary motive for posting it in the first place.

74.     The closest any of the individual defendants have ever come to offering any motive beyond "because I can and I want to" can be found in **Exhibit 101**. Near the start of that conversation, he says that he wants to punish me, in part because I "treat all of [my] members badly, especially when they disagree with [me] even in the slightest, even on [my] live streams [I'm] constantly shouting at [my] viewers for trying to help."

75.     But even then, this is demonstrably false and Mr. Allison knows it. **Exhibit 103** shows the entirety of my DM history with his account that I used to trust. In that DM history, you can see that I have had discussions with him about politics. Yes, *politics*, one of the most polarizing, friendship-killing topics in existence, and I am able to have disagreements with him on politics, while we still respect each other's opinions! If we can remain civil while disagreeing about political issues, then certainly I can remain civil with you if you disagree with me "even in the slightest." So not only are his accusations that I treat people badly over the slightest disagreement, but I am able to prove that accusation to be false *with previous conversations I have had with that same person!*

76.     If asked themselves, they would likely fancy themselves as social justice warriors, exposing corruption because it's the right thing to do. But you can't even call them that. If they were exposing some scandal in Congress, or whistleblowing how corporations like Amazon.com treat their employees like complete trash, then maybe you could make the argument that those who expose that kind of bullshit are doing the right thing, simply because it's the right thing to do.

77.     But you can't make that excuse in this case. I run a *gaming* channel. I do streams where I play games and do my best to add witty commentary. I sometimes make videos where I express my opinions about games and discuss their stories and gameplay mechanics. Who the hell am I harming by just trying to grow a channel with that kind of premise?

78.     No, by the individual defendants' own admission, this all started because my "videos are pretty shitty." See **Exhibit 02**. That's it. That's all there is to it. They are attempting to ruin my career simply because they don't enjoy my content. They aren't even *pretending* like there is anything more to it than that. Put simply, the individual defendants not only have failed to offer any legitimate motive behind their actions, but have gone out of their way to make it clear that there *is no other motive* besides (as I have repeatedly said in this case so far) "pure hatred, pure malice, pure spite."

### The individual defendants are incorrigible hypocrites.

79.     "Incorrigible" is an adjective that means unable, or stubbornly unwilling, to be reformed or rehabilitated. Meanwhile, "hypocrite" is a noun that refers to a person or group of people who criticize others for engaging in real or perceived behavior that they themselves practice without shame or irony. When you put those two words together, the resulting descriptor begins to describe the individual defendants to a tee.

80.     The individual defendants have been repeatedly sanctioned (include warnings, content

removals, and even account terminations) by the websites on which their behavior has been perpetrated. See **Exhibits 11**, **12**, **21**, **30-34**, **44**, **58**, **60**, **62**, and **87-88**. Bear in mind that these are just the sanctions that I have screenshot & video evidence for. Like I said in the "ban evasions" section, you can check every alternative account that the individual defendants have used to harass and dox me, and find that many of them (at least on Reddit) have been suspended.

81.     The individual defendants accuse me of "abusing" the DMCA in order to have content removed that I don't like. But in the aforementioned instances, these weren't even DMCA takedowns! They were complaints for harassment, impersonation, and doxxing. The websites hosting this content have § 230 immunity in these cases. It is their conscience, not their desire to avoid a long and expensive legal battle, that compelled them to act in these cases. This means that third parties have reviewed the case and, entirely out of their own sense of right and wrong, decided that the individual defendants have engaged in unscrupulous and unacceptable behavior.

82.     Despite repeatedly being told by impartial third parties that their conduct is unacceptable and that they need to knock it off, the individual defendants still insist – with cuss-filled rants if you try to disagree – that they are in the right. Despite repeatedly sanctions, they persist in their behavior. Polano's "Acerthorn Exposed" stream on Twitch was taken down for violating community guidelines, as depicted in **Exhibits 30-34**? That's fine, let's just prepare a video on *youtube* and try again (see **Exhibit 81**). Even though Youtube has the exact same prohibition against doxxing that Twitch does, it doesn't matter. Even though, on Twitch, removal of content is a punishment on par with account suspension (meaning he really dodged a bullet by not losing his entire Twitch channel right then and there), no matter. That was a fluke. Let's just try again on Youtube.

83.     These people are utterly incapable of learning from their past mistakes! Their incorrigibility is all the more baffling when you realize that they seem to think I'm the one who "cannot take responsibility, nor accept criticism." See **Exhibit 81**.

84.     They criticize me for "continu[ing] to risk a Youtube/Twitch Account suspension," (see **Exhibit 73**), yet the only account suspensions that have been handed down in relation to this entire debacle have been suffered exclusively by them!

85.     They say I'm a "manchild" (see **Exhibit 81**; see also Exhibit 29, timestamp 1:28: "I swear this 32 year ball of fat manchild is incredible"). They say that I treat people badly "especially when they disagree with [me] even in the slightest," (see **Exhibit 101**, timestamp 0:01). Yet they are the ones going absolutely apoplectic at the slightest indication that I disagree that their infringements are fair use.

86.     They repeatedly say I'm insane (see the entire earlier section on hate speech), but the definition of insanity is "doing the same thing over and over again and expecting different results." By that definition, the individual defendants, who persist in their behavior despite repeatedly being told by the host websites to knock it off, are clearly the insane ones.

87.     All in all, I think I have done a fairly good job of showing you just how long, far, and

deep the defendants' hate campaign against me has gone. If this doesn't convince you, then please allow me to dedicate a section to explaining why, as a matter of law, the individual defendants are highly unlikely to succeed on the merits in this case, even if they appear.

**ARGUMENTS**

88.     For the most part, I would like to think the exhibits speak for themselves, and that they speak wonders for the harassment, doxxing, hate speech, and ban evasions I have been made to endure. The corporate defendants would be more than justified in permanently banning the individual defendants, just on community guidelines violations alone. But for the sake of argument, let's assume that they appear in this case and we proceed to litigate the copyright infringement. I still believe they have a very poor chance of winning.

**Unclean hands as a counter-defense to fair use**

89.     The individual defendants have made it clear that they intend to invoke the affirmative defense of fair use. If they do, I plan to argue that the individual defendants have acted with "unclean hands," and that this should serve as a counter-defense to fair use.

90.     Fair use is classified as an "equitable defense." See Fisher v. Dees, 794 F. 2d 432, 435 (9th Cir. 1986). If it is an *equitable* defense, then common sense dictates that the *equitable* doctrine of "unclean hands" is an exception to it. Also, it has been held that "fair use presupposes good faith and fair dealing. See id at 437-38 ("One theme running through the composers' briefs is that Dees's alleged bad conduct should bar his use of the equitable defense of fair use. The principle invoked is sound. Because fair use presupposes good faith and fair dealing, courts may weigh the propriety of the defendant's conduct in the equitable balance of a fair use determination"). See also Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539, 562 (1985) ("Also relevant to the character of the use is the propriety of the defendant's conduct. Fair use presupposes good faith and fair dealing").

91.     It is important to note that, even if the individual defendants' actions are not independently actionable as a crime or a tort, their behavior can still constitute unclean hands. See Precision Co. v. Automotive Co., 324 US 806, 815 (1945) ("one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the [judge]"). So even though the Court has dismissed, sua sponte, my claim for intentional infliction of emotional distress, I can still raise unclean hands as a counter-defense to fair use.

92.     I have not one, but three different legal theories upon which the individual defendants can be said to have acted with unclean hands:

<u>Unclean Hands #1: Illegaly Obtaining the Footage</u>

93.     As I stated in the complaint, the only way the individual defendants could have acquired the raw footage in order to make these infringements in the first place is by illegally download-ing it. There is no way to download from Twitch directly (unless you are logged into the account of the streamer who did the stream, and they logged into my Twitch account to download the

streams, that is a violation of my rights in itself), and while Youtube Premium members do have the ability to download other people's videos, the individual defendants could not possibly have gotten the footage from there, since I have restricted viewership of that video to those who pay my channel $20 per month, and none of the individual defendants have done that. I have not posted the accidental stream on any other platform.

94.     Therefore, the only way they could have acquired this footage in the first place is by downloading it using third party software. This forms the basis of my first and second counts of copyright infringement in the operative complaint. Downloadng a stream using third party software is just as illegal as using a torrent app to download an entire movie or video game without paying for it. Granted, litigation over these sorts of illegal downloads is admittedly rare, but that's usually because the people who do it tend to keep their heads down. They don't announce with trumpets what they've done, provide their IRL name and address to the copyright holders, dare the copyright holders to sue them, and rub it in the copyright holders' faces.

95.     More importantly, because the individual defendants necessarily acquired the footage by unlawful means, that means that any subsequent uses of the footage are automatically not fair use, even if those same videos might be considered fair use under otherwise identical circumstances. Support for this legal theory is found in the case of Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985). "Fair use presupposes good faith and fair dealing." See id at 562. "The Nation acted in bad faith, the [trial] Court claims, because its editor 'knowingly exploited a purloined manuscript.'" See id at 592. Although the Supreme Court found that there was insufficient *evidence* that the defendant had knowingly exploited a purloined manuscript (an evidenciary hurdle I expect to have no trouble clearing in the instant case), it nonetheless upheld the implication that, if the defendant(s) had indeed "knowingly" exploited a "purloined" copy of the work, then as a matter of law, this would indeed constitute bad faith and therefore be a bar to fair use.

96.     In the alternative, consider this legal theory: Because their illegal downloading of the footage constitutes my first count of fair use, that means that, if they had never committed that first count of infringement, then they never would have been *able* to commit any of the subsequent infringements, even if they wanted to. Therefore, undoing all the subsequent infringements – even those that would otherwise be fair use – is an essential part of the equitable relief needed to make me whole on the first count of infringement.

### Unclean Hands #2: Designed to harass and dox, rather than criticize or comment

97.     As I have extensively proven, the individual defendants are acting out of pure malice and spite towards me. They desire nothing more than to harass me for its own sake, dox me for its own sake, and ruin my career for its own sake, all because simply don't like my content. They are not even *pretending* like there is anything more to it than that.

98.     Their copyright infringements are clearly part of this ongoing campaign of harassment and doxxing. Even if that wasn't clear from the aforementioned evidence, it can still be *reasonably inferred* from the aforementioned evidence. See Fed. R. Evid. 404(b)(2) (holding that past

or concurrent wrong acts are admissible to prove motive, among other things).

99.     Because the individual defendants are acting out of a motive of pure malice, that should handily prove the bad faith of the individual defendants. For this reason, even if those same videos could be considered fair use if they were made and published with a more benign motive, their malicious motive in this case means they are automatically not fair use, to the exclusion of all other factors.

<u>Unclean Hands #3: Failure to exhaust DMCA administrative remedies</u>

100.     But even if the long pattern of harassment and malice is not good enough to show that the individual defendants are acting with unclean hands, I still maintain that their claims of fair use should be precluded in a majority circumstances.

101.     As I pointed out before, the individual defendants have only filed three DMCA Counter-Notifications during this debacle. Two of them, however, were to counter the takedowns of videos that had already been taken down before by alternative accounts. The older videos, however, did not have counter-notifications issued against them. As I explained in the "facts" section of this report, that is automatically grounds for account termination. But even as a matter of law, I believe it should bar the individual defendants from being allowed to litigate the two infringements that were just repeats of previous infringements.

102.     Think about it this way: Imagine if you are banned from a brick & mortar business, and you believe the ban was discriminatory (e.g. it was done on account of your religion or your real or perceived disability). But because you feel that filing a discrimination lawsuit in federal court is not worth your time or money, you proceed to simply put on a disguise and re-enter the business. Well, as a matter of law, not only is the illegitimacy of your ban not going to be an affirmative defense to your new trespass charge, but even if you eventually decide to file a discrimination claim afterwards, your claim of discrimination will at that point be foreclosed to you, even if you might have had a legitimate discrimination claim in the first place. Too late, you should have gone through the proper channels from the outset.

103.     The same logic applies here. If the individual defendants believed their infringements were fair use, they should have gone through the proper channels from the outset, not had friends re-upload the infringements in an attempt to re-route my litigation efforts onto a defendant who is actually willing to go through the proper channels himself. Even if the DMCA Counter-Notification might be considered proper in a vacuum, the fact they waited until it was tactically beneficial to them to do so strips it of its legitimacy. For this reason, all infringements where the individual defendants did not issue a proper DMCA Counter-Notification should be viewed by the courts as "uncontested." As such, the Counter-Notifications depicted in **Exhibits 94 & 95** should be stricken under a combination of unclean hands, res judicata, collateral estoppel, laches, and the equitable principle of "vigilantibus non dormientibus aequitas subvenit."

104.     Under this theory of unclean hands, the Twitch stream which forms the basis of the 16th count of copyright infringement (see ¶¶ 60 & 85 of the Second and Third Amended Complaints)

is the only infringement individual defendants should be allowed to litigate, as it is the only one where a Counter-Notification was properly issued and where the video that was taken down is not simply a re-upload of a previously-removed video whose removal is uncontested. Of course, even that is assuming that the first two grounds for unclean hands do not constitute absolute bars to their claims for fair use in totality.

### Fair use: The four-factors test

105.    But for the sake of argument, let's assume that we simply have to address fair use on the merits, and address the four factors test. Even if the individual defendants get their day in court on the issue of fair use, their case for fair use is so poor that it's mind-boggling how they can justify it even to themselves.

106.    For record, not all of the individual defendants believe it is fair use. As I demonstrated in my Motion for Preliminary Injunction, Raul Mateas has admitted (perhaps without realizing that he was a co-defendant in the case as well) that Polano's video is not fair use. See **Doc 57-11** ("I know Sofiann is gonna lose anyway lol I told him like 4 months ago not to counter the claim cause it's most likely not fair use due to the clip mostly being footage from your stream"). Of course, that just goes to show how little the other individual defendants have thought this through.

107.    In any event, let's discuss fair use.

### The Infringing Uses

108.    To be clear, not all infringements are *exactly* the same. There are seventeen infringements that are listed in the complaint. However, the first two are the illegal download and then the subsequent sharing of that raw footage. Those are not fair use. In fact, fair use is not even *available* as a defense as a matter of law for those infringements, just like how it isn't available as a defense as a matter of law for movie, music, or software piracy. So that leaves 15 infringements remaining.

109.    Of those infringements, Counts 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 15, and 17 all verbatim reproductions of the "strange noises" section of the accidental livestream, with no alterations or modifications whatsoever. For these infringements, we can take them off the table entirely, since they cannot possibly be fair use if there's literally nothing for the defendants to say constitutes fair use.

110.    This leaves Count 7, 14, and 16 as the individual defendants' last bastions of hope for claiming fair use. Of those three infringements, two of them (Count #7 and Count #14) constituted nothing more than the "strange noises" section of the accidental livestream, bookended by some gum commercial clips, and absolutely nothing else. As you can see from the exhibits, there are several other instances of these uploads that I forgot to include in the Complaint, although I will include them if any of the individual defendants ever appear in the

case.[9]

111.    Count #16, meanwhile, is a multi-hour-long livestream. You can see an archive of that livestream by looking at **Exhibit 48** of the attached exhibits. At timestamp 0:05:59 – 0:08:03, he plays the "strange noises" section of my accidental livestream. While playing this clip, the only changes he makes to this footage are putting on some unrelated music and dancing in his chair.

112.    Last but not least, we have the "what happens when you blind yourself"/"Acercock" videos. These are the only infringements that do not depict the "strange noises" section of the accidental livestream. However, I still feel they fall short of fair use for reasons I will explain momentarily.

113.    So for purposes of discussing fair use, let's group these infringements into three categories:

    (a)     **GROUP A** – The 5-Gum commercials.

    (b)     **GROUP B** – The "What happens when you blind yourself"/"Acercock" slideshows.

    (c)     **GROUP C** – The stream which forms the basis of the 16th Count of Infringement.

114.    The infringements mentioned in ¶¶ 106-107 do not get a group, because like I said, those have absolutely no chance of being fair use, so it's pointless to even discuss them.

115.    With that said, let's look at each of the factors of fair use and see how each group falls short of the bar.

<u>Factor #1A: Commerciality</u>

116.    All commercial use of a copyrighted work is presumptively unfair. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1152 (9th Cir. 1986). However, "commercial use" does not mean that the defendant is intending to profit from the use. As long as the infringer *stands to* profit from the use, then the use is commercial. See *id*. Moreover, using the copyrighted work as part of an appeal for donations is a type of commercial use, even if the monetary benefit is only incidental. See *id* ("contends that he sent the parody to his followers to give them information to rebut the statements it contained, and that the appeal for money was ancillary … All of the letters and television displays involved outright appeals for donations to the Moral Majority to support Falwell's lawsuit against Hustler or to the Old Time Gospel Hour to support his radio and television network").

117.    The Group C infringement falls handily within this definition of commercial. This stream

---

9    In the event of a default judgment, the relief granted by the court cannot exceed what was requested in the complaint. But in any other instance, the court can grant whatever relief justice requires, even if it wasn't requested in the complaint. If any of the individual defendants appear in the case, I plan to raise the additional uploadings and demand statutory damages for them.

was originally broadcast on Karl Polano's Twitch channel, at www.twitch.tv/sofiannp. If you go to that webpage, you will see that there is an icon you can click on to "subscribe" to his channel (in other words, to support him with monthly financial donations). Just on this alone, anything he does on his Twitch channel automatically fits the *Hustler* definition of "commercial."

118.    For Groups A and B, it's a bit more complicated. However, there is still a grounds upon which we can consider this use to be commercial. There is some legal precedent to suggest that uses are commercial, even if the infringer is not directly profiting from the work, as long as *someone* other than the copyright holder and his licensees is profiting from the infringement *at some point* in the infringement's circulation or distribution.

119.    Check out this webpage: https://www.insidehighered.com/views/2011/08/02/myths-about-fair-use. Scroll down to Myth #3, and it states …

> **Myth #3: Fair use is easy for an academic — I can take whatever I want because everything I do is noncommercial.**
>
> Reality: Working noncommercially does give you some privileges, but you'll be stuck in a gray zone if you depend on that to justify fair use. You won't be able to circulate your work in academic journals (they carry ads) or books (even nonprofit publishing houses sell their books). Even when you contribute for free to online sites, somebody's conducting commercial activity — perhaps an advertiser placing ads on a site, or a data miner. Noncommercial entities conduct commercial activities; Association for Research Libraries member libraries collectively spent over $1.3 billion on licensing and purchasing new materials in 2009-10. (A publishers' lawsuit against Georgia State University is currently sounding some legal issues around libraries' fair uses of these materials.)

120.    Applying that standard to the instant case, bear in mind that the individual defendants have used Youtube, Discord, Twitch, Instagram, and even Reddit to circulate and distribute their infringement. These are all for-profit companies, and although most of them (Facebook being a notable exception) have complied with DMCA safe harbor guidelines, that only means that they themselves are not liable for this infringement. It still means that the individual defendants' infringements are considered "commercial" for purposes of fair use.

### Factor #1B: Transformative

121.    This is one of the most important factors in the entirety of the fair use determination. A lack of transformative value is often singularly fatal to an infringer's fair use case. See Castle Rock Entertainment v. Carol Pub. Group, 955 F. Supp. 260, 268 (SD NY 1997) ("The question of whether a work is transformative must ... be most decisive when answered in the negative. If a work is not transformative, fair use should perhaps be rejected without further inquiry into the other factors") (citations and quotations omitted). See also Campbell v. Acuff-Rose Music, Inc.,

510 US 569, 580 (1994) ("[T]he heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works. If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, … the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger") (citations omitted).

122.     For Group A, the individual defendants insist that these videos are transformative because they are "parody." They make absolutely no effort to justify these videos as transformative beyond that. However, to put it simply, that is not good enough as a matter of law. See Campbell, supra at 581:

> "Like a book review quoting the copyrighted material criticized, parody may or may not be fair use, and petitioners' suggestion that any parodic use is presumptively fair has no more justification in law or fact than the equally hopeful claim that any use for news reporting should be presumed fair. The Act has no hint of an evidentiary preference for parodists over their victims, and no workable presumption for parody could take account of the fact that parody often shades into satire when society is lampooned through its creative artifacts, or that a work may contain both parodic and nonparodic elements. Accordingly, parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." (internal citations omitted)

123.     The 5-Gum commercial clips do absolutely nothing to provide any sort of commentary, criticism, or ridicule regarding the "strange noises" clip from the accidental livestream. It is important to keep in mind that, when the fair use statute and case law say things such as "commentary" or "hold up to ridicule," they mean that the infringer must provide things of more substance than just "that was cool" or "ha ha ha ha ha ha." To be considered "transformative," the infringer must add something to what makes the original valuable. See Los Angeles News Service v. KCAL-TV Channel 9, 108 F. 3d 1119, 1122 (9th Cir. 1997). See also Seltzer v. Green Day, Inc., 725 F. 3d 1170, 1176 (9th Cir. 2013) (holding that, to be considered transformative, there must be "the creation of new information, new aesthetics, new insights and understandings").

124.     In laymen's terms, to be considered transformative, you must provide some additional insight or commentary onto the target work that the audience, in all likelihood, would not have noticed of their own accord if you had simply shared the clip without any alterations.

125.     So that begs the question … what do the gum commercial clips add to the experience that the audience wouldn't get simply by watching the "strange noises" clip alone?

126.     Absolutely nothing!

127.     Therefore, it is not transformative. Period.

128.    Now, for the record, I have no opinion on whether or not the inclusion of my accidental stream clip could be viewed as a parody *of the 5-Gum commercials*. I do not have Article III standing to sue over that. However, it also does not matter, because the 9th Circuit has held that, when two or more copyrighted works are included in one self-proclaimed parody work, all works must be lampooned by the presence of each other in order to truly be fair use. If only one is lampooned by the other, that doesn't count. See Dr. Seuss Enterprises, LP v. Comicmix LLC, 983 F. 3d 443 (9th Cir. 2020) (conceding that the defendant's work might be a parody of Star Trek[10], but not a parody of Dr. Suess). So Group A is decisively and conclusively not a parody for purposes of this case, and is not otherwise transformative.

129.    Group C fares no better. The section of that stream where he plays the "strange noises" clip from the accidental stream can be found at 5:59 – 8:03. The only thing he adds is the addition of new music, accompanied by him dancing in his chair. Put simply, this is not transformative. See Comicmix, supra at 453 ("the addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative"). Unless this music and dance choreography actually *adds new insights or understandings* to the original, then it is not transformative. And does it do that? No, absolutely not.

130.    Group B is an interesting case, since it one of the few groups of infringement that does not rely primarily on copying the "strange noises" clip from the accidental livestream. You could indeed watch the video in Group C and get a very different experience than you would get watching the accidental livestream or any clips therefrom. That being said, it is still not transformative in the fair use sense.

131.    These videos start by depicting me wearing a blue shirt and ball cap. Then the image changes so that I am now shirtless and hatless. Because I am sitting down, you cannot see my lower body and, therefore, cannot see my pants. Because of this perspective, it looks like I am naked in the second shot. This illusion of nudity, combined with the original title of this video ("What happens when you blind yourself") suggests that the individual defendants were attempting to make a masturbation joke with this video.

132.    However, that does not constitute fair use. At best, this should be classified as a satire (lampooning society as a whole), not a parody. The defendants did not need to use any images from any of my streams in order to make that joke. They could have used anybody for that purpose. In fact, any one of the individual defendants could have posed for those pictures *themselves*, and the masturbation joke would have made just as much sense. See Campbell at 580-81 ("Parody needs to mimic an original to make its point, ... whereas satire can stand on its own two feet and so requires justification for the very act of borrowing"). To be transformative, the commentary, criticism, or ridicule must be directed at the copyrighted work directly; merely targeting society as a whole does not cut it. See Dr. Seuss Enterprises, LP v. Penguin Books, 109 F. 3d 1394, 1400 (9th Cir. 1997) ("The parody must target the original, and not just … society as a whole (although if it targets the original, it may target [society as a whole] as well)"). See also Equals Three, LLC v. Jukin Media, Inc., 139 F. Supp. 3d 1094, 1105 (C.D. Cal 2015) ("Equals

---

10  See *id* at 454: "While Boldly may have altered Star Trek by sending Captain Kirk and his crew to a strange new world …"

Three thus admits that its purpose of using Jukin's video was to make two general, broad points that were not directly aimed at criticizing or commenting on the video. The use of Jukin's footage to make these two points is akin to using news footage without adding anything transformative to what made the footage valuable").

133.     The individual defendants later changed the title of this video to "Acercock," perhaps in an attempt to make the video about me specifically. However, I do not expect the court to be amused by their post-hoc attempts to retroactively shoe-horn some transformative purpose into an infringing work where no transformative value exists. See Comicmix at 453 ("We also reject as 'completely unconvincing' ComicMix's 'post-hoc characterization of the work' as criticizing the theme of banal narcissism in Go!. The effort to treat Boldly as lampooning Go! or mocking the purported self-importance of its characters falls flat").

134.     So all in all, the infringing works in this case simply are not the least bit transformative. Group B is the only group that shows even a de minimus showing of creativity on their end, but even then, there was no reason they had to use *my* work as an asset in that video.

### Factor #2A: Published or Unpublished

135.     We mustn't forget that this livestream was an accident. It was never meant to happen. Because of this, I believe that the original broadcast of the stream on April 10, 2021 should be treated as a leak, rather than a publication, for purposes of copyright. While I eventually did upload the stream to my Youtube channel on my own terms, I did not do so until April 28, 2021.

136.     Therefore, for Infringement Counts 1-9 (all of which occurred before April 28), the copyrighted work should be considered unpublished, and should weigh against fair use accordingly.

### Factor #2B: Fact or Fiction

137.     This factor also weighs against a finding of fair use. While it is true that facts are given less copyright protection than fiction, and the fact that the accidental livestream showed a day in my life (which could be considered nonfiction), it is important to note that, when lawmakers and copyright law scholars say "facts," they typically mean things such as history, science, or politics, aka things of public importance. Simply peaking into one person's personal life on some random day, when he is alone in his own home, minding his own business and hurting no one, is, quite simply, not consistent with the public policy interests fair use was designed to protect. By contrast, it absolutely serves the individual defendant's personal agenda of harassing and doxxing me, but such malevolent motives, at best, do not help them in their case for fair use, and at worst, actively hinder their case for fair use.

### Factor #3: Substantiality of Portion Used

138.     This factor also weighs against a finding of fair use. While it is true that Defendant's video was only a few seconds to a few minutes long, whereas my accidental livestream was

nearly 2 hours long, with the exception of Group B, the individual defendants used the most substantial portion of my accidental livestream. They used the "heart" of the accidental livestream, and therefore, this factor should be construed in the individual defendants' disfavor.

139.    Group B is the only exception here. If the individual defendants appear in this case, I will include the Group B infringements as additional counts of infringement (see Footnote #9 for details), and I will concede that this group of infringements only uses one frame from the accidental livestream; it uses no audio from the accidental livestream, and the one frame it uses is not the heart. But even barring that, the complete lack of transformative value means it still is not fair use.

<u>Factor #4: Effect on potential market</u>

140.    "This last factor is undoubtedly the single most important element of fair use. Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." See Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539, 566-67 (1985). Also, alongside being transformative, when this factor is not met, it is fatal to a fair use determination, even to the point of being singularly dispositive. See *id* at 568 ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work. ... If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair") (internal citations and quotations omitted).

141.    In the instant case, not only are the individual infringements reasonably likely to usurp the market for my accidental livestream (see Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1154 (9th Cir. 1986) ("In fact, by copying all or substantially all of the copyrighted work, 'the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's'")), but even by the individual defendants' own admission, that is in fact their express goal with this infringement. See **Exhibit 76** ("so much for having to pay lmaoo im gonna be spreading around this all over the place").

**Conclusion on Argument**

142.    So in conclusion, the individual defendants simply have no leg to stand on, period. The only reason they were able to do any of these infringements is because they illegally downloaded the footage using third party software, meaning that undoing all the subsequent infringements is an essential part of the equitable relief to make me whole for the first count of infringement, even if those videos were otherwise fair use. The fact that they are only doing this to harass and dox me, rather than criticize my work, means they should lose the defense of fair use due to the counter-defense of unclean hands.

143.    But even if we have to consider fair use, the individual defendants have managed an impressive feat of failure. They have managed to achieve a clean sweep of all four factors weighing against a finding of fair use (mostly because, due to their hate campaign against me,

they were *actively trying* to not make it fair use). Their works are not transformative. Many of these infringements happened before publication. The vast majority of them use the "heart" of the work, and by the individual defendants' own admission, their goal is to keep people from having to pay to see the stream archive. It's mind-boggling how their infringements can fall so far short of the bar for fair use, yet they act like *they're* the ones being harassed when I have these videos and streams taken down.

144.    In short, the Defendants are exceptionally culpable and exceptionally liable, and there is no two ways about it.

## MY PROPOSAL

145.    So I hope, in the past nearly-three-dozen pages, I have thoroughly demonstrated that the individual defendants are absolutely unscrupulous pieces of crap whose presence on your clients' platforms are unbelievably toxic to the communities your clients are attempting to foster.

146.    However, there is one problem: Two of the three individual defendants still need to be served with process, and because they are foreign defendants, doing so will take a long, long time. While it would be nice if we could simply terminate their accounts and channels, they also need to appear in this case. So perhaps we can work something out.

147.    I propose that your clients proceed to lock the accounts of every individual defendant. While locked, the individual defendants should be unable to do anything in those accounts. And when I say "anything," I mean *literally anything*. They should be unable to make purchases on Amazon.com, unable to even watch any twitch streams or Youtube videos, let alone post anything in the chats or comments. They shouldn't even be able to use the Google search engine while their accounts are locked! Now, if they log out of their accounts, then they can proceed to do things that don't require logging in (such as using the google search engine or watching videos and streams without commenting or chatting), but only if they remain logged out and in private windows.

148.    Bear in mind that I am asking you to lock ALL their accounts. I have provided every account that I know about, but I expect they may have more than that. I would humbly ask Alphabet and Amazon to do their research and find any other accounts that show a high likelihood of being owned by any of the individual defendants, and locking them too.

149.    While logged in, they should be met with a message from defense counsel. This message should ideally communicate the following things to them:

(a)    Their accounts are being locked because they are named defendants in Case 4:21-cv-04184-JSW Stebbins v. Polano in the United States District Court for the Northern District of California, but they have not appeared in the case.

(b)    Their accounts will remain locked for 30 days.

(c)    After 30 days, their accounts will be permanently terminated, and they will not be able to create any new accounts in the future, UNLESS they voluntarily appear in the case.

(d)    "Voluntarily appearing" means notifying the Court that you [the individual defendants] are waiving service of process, and then proceeding to file either an "Answer to Complaint" or a "Motion to Dismiss."

(e)    If they voluntarily appear in the case, their accounts will be unlocked for the duration of the case.

(f)     Provide a weblink to an online version of the Second Amended Complaint (the current operative complaint) so they may review the complaint.

(g)     Advise them that, if they cannot afford counsel in this case, they should consider contacting the Legal Help Center Federal Pro Bono Project – either by emailing them at fedpro@sfbar.org or calling them at +1 (415) 782-8982 – and scheduling and appointment to advise them on how to proceed pro se (representing yourself).

(h)     Also advise them that they can appear in the case more efficiently if they register for e-filing. Pro se litigants (those representing themselves) are already authorized to register for the e-filing without prior leave of court. Simply go to https://cand.uscourts.gov/cases-e-filing/cm-ecf/setting-up-my-account/e-filing-self-registration-instructions-for-pro-se-litigants/ and register for an e-filing account.

(i)     Provide the emails and office phone numbers of respective counsel in case they have any questions concerning this account lock, the impending termination, or how to voluntarily appear. However, you are not their counsel and will not advise them on the merits of their case, or in any manner of the case except how to voluntarily appear.

(j)     If you want, you may also throw in an explanation that their accounts have been associated with an alarming amount of targeted harassment and doxxing against David "Acerthorn" Stebbins, and that this is one of the biggest reasons behind their accounts being locked.

150.    If, after 30 days, they have not voluntarily appeared in the case, then you should make good on the threats mentioned in sub-paragraph (c) above.

151.    Now, in the event they do not appear in the case (or if they do appear and then lose on the merits, leading to an injunction like what I requested in ¶¶ 124-126 of the Second Amended Complaint), and you have to permanently terminate their accounts, there is a possibility that they may create new accounts to bypass these bans. It is almost certain that they will *attempt* to create new accounts to bypass these bans. To circumvent this, let's discuss …

**POTENTIAL MONKEY WRENCH: USAGE OF UTIPAs TO EVADE AN IP BAN**

152.    The most common way to ensure that banned users do not come back is to ban their IP addresses as well as their accounts. However, in recent years, there are a startling number of new ways people can evade even an IP address ban. Many people have access to what I will refer to as "Un-Traceable IP Addresses," or UTIPAs for short (pronounced *yoo-TEE-puh*). Examples of utipas include, but are not limited to, VPN services, public wi-fi hotspots (such as those provided by businesses like Starbucks to their customers), and the Tor browser.

153.    Mr. Allison has proven himself especially willing to use UTIPAs to evade bans. In fact, as I demonstrated in **Exhibit 75**, pages 5 & 6, he was able to create a new account a mere three minutes after his previous account as banned. Also, while not the worst offender, Raul Mateas has shown himself willing to create new accounts after his old accounts were banned (see **Exhibits 86 & 87**) and is willing to create throw-away Youtube channels to avoid his primary channel suffering the consequences of his behavior (see **Exhibit 79**).

154.    So we should fully expect the individual defendants to use every trick up their sleeve to attempt to slip back onto your clients' sites under the radar. So I think your clients should have to take steps to keep them from doing that.

**Case Law on the Issue**

155.    Now bear in mind that I ask for nothing more than what I would be entitled to under 17 USC § 512(j) if I prevailed on the merits against the individual defendants. Since that's all you're in this case for anyway, and all I could hold you to even if I prevailed, it makes little sense for me to demand more than that from you as part of a settlement offer. So that begs the question … are you *required*, both under § 512(j) and under § 512(i)(1)(A), to actually take reasonable steps to prevent terminated users from rejoining?

156.    The short answer is yes, you are. See https://www.law.uh.edu/faculty/cjoyce/copyright/release10/amrecords.html, an unpublished ruling on motion for summary judgment, where the Court held that Napster was required to take "all reasonable" measures to keep terminated users from rejoining[11], and there was a genuine fact issue as to whether an IP address was reasonable[12]. This case was referenced in the published court opinion of Corbis Corp. v. Amazon. com, Inc., 351 F. Supp. 2D 1090, 1108 (2004), so it holds at least a little legal weight.

157.    Nowadays, the availability and reasonableness of an IP address ban is common knowledge; no expert testimony required. However, like I said earlier, that may not be enough, since, with the rising popularity of UTIPAs, it is not only possible these days, but often quite easy, for malicious and disingenuous users to bypass even an IP address ban, even multiple times

---

11  "Summary adjudication is also inappropriate because Napster has not shown that it *reasonably* implemented a policy for terminating repeat infringers." (emphasis in original)

12  "Napster does not block the IP addresses of infringing users, however, and the parties dispute whether it would, be feasible or effective to do so."

a day, and in extreme cases (like in **Exhibits 74 & 83**), multiple times *per hour*! Therefore, if any additional measures can be taken to curb this practice, and those measures are considered "reasonable" by the Court, then internet service providers (such as your clients) are required to implement those measures.

158.    To that end, I have a few suggestions of measures you could take. I believe these are reasonable measures, and I also believe that they would be effective at stopping people from rejoining after a DMCA-mandated termination, especially if they were all applied in tandem.

### Work-Around #1: Stopper Apps

159.    Whenever a user creates an account on your clients' sites, those sites usually install cookies onto their computer. These cookies allow the sites to monitor the users' browsing habits, so the sites can see what makes the user tick and offer personalized options (such as video, stream, or product recommendations, or running personalized and targeted advertisements) on your clients' sites.

160.    Along that same vein, whenever you ban a user, you could install a "stopper app" on their computer or phone. These apps would be only a few bytes in file size, and would prevent those devices from accessing the sites. Whenever a banned user attempted to load a webpage on one of your client's sites, the stopper app would prevent the webpage from loading. Because the stopper app is installed on the device directly, it would work regardless of whether they are using a UTIPA.

161.    Ideally, this stopper app would be hidden from normal users (although those who know exactly what their doing would be able to make them visible), and ideally, it should be nearly impossible to uninstall them. Ideally, the only way to uninstall these apps would be to perform a clean install[13], and the only reason I accept that method of uninstallation is because, to my knowledge, it is literally impossible for any non-essential software to survive a clean install (if it weren't impossible, you'd better believe viruses would have jumped on that bandwagon long before now).

162.    Now, is it even possible to have software that can't be uninstalled? Yes, it is. For example, in 2008, Electronic Arts was sued in a class action lawsuit because its video game "Spore" had installed some spyware on its users' computers that couldn't be uninstalled. The basis for the lawsuit was not the fact that the spyware was uninstallable, but the fact that the game's EULA and terms of service did not warn its users that this spyware was going to be installed. See https://www.shacknews.com/article/54887/spore-drm-prompts-5m-class. Your clients could avoid a similar class action lawsuit through the simple expedient of updating their own terms of use to give themselves permission to do that with regards to their stopper apps in the event of a ban.

---

13 A clean install is also sometimes known as an "OS reinstall" or a "factory reset." It effectively purges all non-essential files and apps from the system and wipes the slate clean. It is often recommended by computer repairmen as a last resort when your computer is infected with a particularly stubborn virus.

163.    Now, while the stopper app could be removed with a clean install, I expect the individual defendants will quickly grow weary of having to do that. Every time they rejoin the site after a clean install, your client would just put a new stopper app on their machine. This means that every time they wanted to rejoin, they would have to do another clean install. And another one. And another. While a clean install would indeed remove the stopper app (though there is nothing stopping your clients from simply putting another stopper app on their computer if they try to come back), a clean install is not a simple and consequenceless procedure. It takes hours to perform, and you lose all of your data when you do. Every … single … last … bit … of … data. Even if the individual defendants use a clean install to get around the stopper apps, I'd imagine they'd only do it two or three times before they realize they're fighting a losing battle and give up.

164.    But, for the sake of argument, let's assume that the individual defendants still find ways around the stopper apps, so they can access the sites and continue to harass and dox me.

**Work-Around #2: UTIPA Restrictions With Address-Verification**

165.    Bear in mind that the biggest problem is the rise of UTIPAs. Were it not for them, an IP address ban would end their rejoining on a dime. So the obvious solution is to simply … block all traffic coming from a UTIPA.

166.    Now obviously, this would be a bad idea if you just up and blocked all UTIPA traffic indiscriminately. VPNs and the Tor browser are one thing, but what about public wi-fi? You would miss out on a lot of business (including business from legitimate, honest, and good faith viewers) if you suddenly prevented people from accessing your sites from their phones while they were out on the town or on vacation. Clearly, if we are going to entertain the idea of blocking UTIPA traffic and have it be considered "reasonable," we need some ways for honest, good faith users to bypass the UTIPA restrictions.

167.    Well, first of all, we could make it so that the UTIPA exemption only applied to those who were logged in. If you aren't logged in, you can still watch videos and streams; you just can't post a comment, live chat, or upload your own videos or streams. Then again, if you can't do any of those things, you also can't harass, dox, or infringe on copyright, so simply being able to *watch* won't matter.

168.    But even barring that, we could still allow the use of UTIPAs, even while logged in, as long as the accounts were created before the announcement of this new policy. The goal here is to prevent people from creating new accounts after their old ones were banned. Just don't create any new accounts (the key word being "new"), and we can't suspect you of ban evasions. Simple as that.

169.    But of course, it's not that simple, since that would foreclose all future accounts, even the legitimate ones. If we want to grow the sites in the future, then new users (truly new ones, not just returning banned ones) need to be welcomed onto the platform with a heartwarming smile. So we're not out of the woods yet.

170.    For one last means of circumventing the UTIPA block, I propose that new users be required to provide some form of address verification. I don't mean phone verification, because as Mr. Allison demonstrates with **Exhibit 56**, there are ways to provide fake phone numbers to get around phone verification security. I mean providing *address* verification, which is much harder to fake.

171.    Now, would address verification be cumbersome or inconvenient for many users? Almost certainly not, because there are many, many ways to provide address verification, and in fact, the vast majority of your users may already have done so!

<u>How to Achieve Address Verification</u>

172.    First of all, the easiest way to achieve address verification is to simply … provide your address. When I signed up for the Youtube Partner Program, as well as the Twitch Affiliate Program, I had to provide my tax information so I could get paid. That should constitute address verification.

173.    But entry into those programs is an elite privilege. What about those who aren't part of any monetization program? Well, as long as you make even one purchase on the site, you should also be considered address-verified. Why? Because whenever you provide your credit/debit card for payment, you are also providing a name and billing address associated with that card. That last one – the billing address – means that you provide address verification any time you make literally any purchase. Buy a product off of Amazon.com? A Youtube Premium subscription? An Amazon prime subscription? Subscribing to any Twitch streamer, or becoming a channel member to any Youtube channel? Giving even a $1 super-chat during a Youtube stream, or providing any bits during a Twitch stream? All of those things cost money, which means you must provide a credit or debit card for the transaction. And with a credit or debit card also comes a billing address, and with that comes address verification.

174.    But even if you don't want to do any of that, surely you must have made at least some purchase on some website in the entirety of the Internet in the past ten years, right? You could achieve address verification simply by associating your account with any one of a wide variety of third-party sites where you have provided your billing information in any way, shape, or form. There are many, many sites that new users could associate with their new Google/Amazon accounts, including, but not limited to …

(a)      Any crowdfunding sites, such as Patreon or GoFundMe;

(b)      Any retail sites, such as Newegg, Ebay, Walmart.com, Target.com, and yes, even our very own Amazon.com;

(c)      Any premium streaming sites, such as Netflix, Hulu, or Disney+;

(d)      Any digital store front, such as Steam, Epic Game Store, the Apple App Store, Nintendo eShop, Xbox Live, Playstation Network, etc., provided that they have made at least

one purchase using actual billing information, rather than just store credit;

(e)      Any major video game publisher (such as EA or Activision) with whom they have purchased any in-game content, such as skins, loot boxes, premium currency, or battle passes;

(f)      The very ISP or phone service provider they are using to access the Internet in the first place, such as Cox, Comcast, Verizon, Sprint, or AT&T;

(g)      and many, many other types of sites.

175.    As you can see, the possibilities for obtaining address verification are quite limitless. Almost nobody will be unable to do it. There will most likely be a statistically non-significant number of people who (A) are genuinely good actors and aren't looking to ban-dodge, (B) are unable or unwilling to provide address verification through any of the numerous methods available to them, and (C) are unwilling to use your sites unless they are allowed to use a UTIPA. Globally, there have got to be less than a thousand people worldwide who meet all three of those conditions at the same time.

176.    But, for the sake of argument, let's assume the worst. Let's assume that, despite the stopper apps and despite requiring address verification, the most truly unscrupulous users continue to find ways to sneak back onto the sites so they can continue to harass and dox people. There is at least one more weapon I can think of that you can have in your back pocket, although it is admittedly a true nuclear option.

**Work-Around #3: Injunctions via Litigation and/or Arbitration**

177.    In ¶¶ 116-120 of the Second and Third Amended Complaints, I compare my current plight to that of a brick & mortar business owner having to deal with harassers who get kicked out of the premises, only to put on a disguise and re-enter to resume their harassment. I point out that, even if their behavior while on the premises was not independently actionable as a crime or a tort, their repeated unauthorized entry into the premises still is. Such entry is trespassing, even if they believe their initial ban was unjustified. Even if they believe their original ban was *illegal* (e.g. if they felt it was discrimination), they would be expected to pursue a discrimination claim in court, not simply re-enter the business because they felt entitled to do so. In that section of the complaint, I point out that the mere fact that this is occurring on the Internet does not change my legal right to control who does and doesn't get to enter my business property.

178.    Along that same vein, if you ban an individual from your site(s), and they re-join (or even *attempt* to rejoin, even if that attempt is thwarted), then you have legal rights which you can vindicate in court. You would absolutely be entitled to an injunction ordering that individual to cease and desist his repeated rejoining of the site. If they continues to join despite that injunction, he can be held in contempt of court, which means he goes to jail. If doing a clean install to get rid of the stopper app doesn't make him back off after two or three tries, serving two or three jail sentences for contempt of court will almost certainly get the job done.

179.     But of course, the biggest question here is … is this "reasonable" to the point where you would be *expected* to do this as part of the DMCA's requirement for you to "reasonably implement" a termination policy? Unlike the two suggestions mentioned above, this one is admittedly a bit trickier, but I still believe it can be considered reasonable.

180.     First of all, I am not asking that you do this in every instance of ban evasion. You can absolutely reserve this only for the most truly incorrigible cases of ban-dodging, only when, as is the case of Mr. Allison, all lesser means of keeping him away have proven to be completely fruitless. That alone should reduce the costs of this nuclear option considerably.

181.     But even barring that, let's not forget that a lawsuit of this calibur would cost pennies compared to the types of cases that corporations usually pursue. In a copyright infringement case, for example, it is not at all uncommon for attorneys fees to reach seven digits. But in a case of re-joining after being banned, there would only be three things you would need to prove: That they were previously banned, that they re-joined afterwards, and that the terms of use they agreed to upon re-joining contained a statement that they certify that they are not ban-dodging by creating this account (which, if the first two elements are proven, is necessarily a lie and therefore necessarily constitutes the tort of "fraudulent misrepresentation"). All three of those essential elements would have clear paper trails enabling you to prove them, and there are no affirmative defenses to this tort[14]. The attorneys fees in this case would be a couple thousand, perhaps even a couple hundred, dollars per case. For foreign defendants, you would likely pay more for service of process under the Hague Convention than you would pay in attorneys fees.

182.     And even then, if the costs of invoking this nuclear option still end up being too great to bear, you can reduce these already miniscule costs even further by including a mandatory binding arbitration provision in your terms of use.

183.     If you still need one last persuasive argument in favor of using litigation or arbitration as a last resort to keep unscrupulous ban-dodgers out of your site, consider this: Earlier in this report, I argued that you should pursue discrimination claims in court if you feel you were discriminated against, rather than simply re-enter the business. I also argued that, if you believed your infringing video was fair use, and that it was taken down in error or fraudulently, then your correct remedy should be to file a DMCA Counter-Notification the first time, not to simply re-upload the infringing content. If you do the latter, I argued that your failure to follow proper procedures the first time should count against you.

184.     When you were reading those arguments for the first time, you (the attorneys, not the clients) were nodding in approval of my logic. Don't deny it. You knew I had valid points when I said that court action was the most appropriate (if not the only appropriate) action in these circumstances.

185.     Well, I can tell you one thing: You are not going to prevail in court by arguing "Well, it's

---

14  Although people can sometimes escape liability for fraudulent misrepresentation by claiming that they simply changed their mind afterwards, you can't claim that when you represent, at the time of creating the account, that you have never been banned from this site before.

only unreasonable if we're the ones expected to have to do it." That's simply not going to fly.

186.     Besides, let's not forget the whole reason we are here in the first place: Because Polano's Counter-Notification forced me to file this lawsuit, otherwise the video would get reinstated! Under the terms of the DMCA, I had only two options: File suit, or capitulate. There was no in-between. It didn't matter that it was obvious to anyone who even casually reviews this case that the individual defendants are a bunch of wholly unscrupulous pieces of shit. It didn't matter that I was forced to go through the Hague Convention to have this lawsuit. None of that mattered. It was litigation or nothing.

187.     So clearly, under the DMCA and the public policies underlying this law, litigation – even compulsory litigation required as part of an ultimatum – is not considered "unreasonable" to expect of a party.

188.     Well, if it's considered "reasonable" for me, then it absolutely would be considered "reasonable" for you, with infinitely more resources at your disposal.

189.     Now again, I am not asking that you be required to do this every single time a DMCA-mandated termination is circumvented. If you can manage to keep him out with lesser means, such as stopper apps or UTIPA-bans unless they have address verification, then all the better. But what I am saying is that, when it comes to litigation *as a last resort*, well … if that's what it takes, then that's what it takes.

190.     And please bear in mind that I am not demanding right now that you have that in your back pocket. If you are not required under the DMCA to use litigation as a last resort to enforce your terminations, then so be it. I am simply putting you on notice that I am prepared to argue in court for that if that's what it takes to truly get these individual defendants out of my hair for good.

## CONCLUSION

191.    I really hope that last subsection didn't sour my good will with you, because it wasn't my intention. In any event, this was a long and arduous task, compiling this report. It was hindered greatly by my computer breaking down right in the middle, but it was still a huge undertaking even without that.

192.    The Defendants have engaged in a months-long pattern of targeted harassment, doxxing, and ban evasions. Their actions are entirely unscrupulous and are deserving of a ban, just on your clients' community guidelines violations alone. Even on the issue of copyright infringement, as I have hopefully demonstrated, their case for fair use is among the weakest you have ever seen. That's not to say that weaker cases for fair use have never existed, but in those cases, the infringer doesn't usually take the case to court.

193.    As I said earlier, the individual defendants have done more than enough to earn a total ban from your clients' platforms just on community guidelines violations alone, but we still need them to appear in the case, so I am willing to be content with their accounts simply being locked until they appear. Once they appear, however, if they ultimately fail on the merits, then I would still insist on the injunctive relief requested ¶¶ 124-126 of the operative complaint.

194.    I hope that this report has convinced you that drastic action needs to be taken against the individual defendants. If they can appear in the case, then we can let the government do the governing. But if they refuse, then your clients obviously don't want people as toxic as them on their platforms anyway. So terminate their accounts.

    Wherefore, premises considered, I humbly pray that Alphabet, Inc. and Amazon.com, Inc. will accept my proposal and proceed to lock the individual defendants' accounts in the hopes of compelling them to voluntarily appear in this case. So requested on this, the 3rd day of November, 2021.

David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
stebbinsd@yahoo.com