## FACTS OF THE CASE

1.      I am a Youtuber and Twitch streamer who trades under the psuedonym "Acerthorn." On April 10, 2021, my streaming software (OBS Studio) came on without me realizing it. The exact reason it came on appears to be lost to history. Maybe I accidentally pressed the key on my keyboard to turn it on. Maybe it was a glitch. We may never know.

2.      I registered the copyright with the United States Copyright Office (or USCO, for short) on May 26, 2021, within three months of publication. Registration was granted and was given the registration number of PA0002305616.

3.      The Court can take judicial notice of the fact that, while filling out the application for copyright registration, there is no space provided whereby the applicant can concede that the work was created by accident. However, the title of the April 10 stream, as it appears in the Public Catalog of registered copyrights, literally contains the word "Accidental[1]," so USCO almost certainly realized that it was created by accident, and still chose to grant registration nonetheless.

4.      The stream is supposed to be gated behind a paywall. If I were to provide a link to the stream in this brief, it would become public record, which means that anybody could legally access it without paying me for it. To safeguard against this, I will send an email to the judge's chambers (and also to all parties, so it will not be an ex parte communication) providing the court with a copy of the work, so it will not be public record.

5.      In any event, because of this accidental turning on of my streaming software, my viewers could see me engaging in my daily activities without me realizing they could see it. At timestamp 40:02, you can see me taking a bite of hot dog before getting up and walking off camera. Almost immediately after I go off frame, you can hear strange noises that sound like barking and snarling. It is disputed whether or not I personally made these noises.

6.      There are plenty of other moments in the stream when I did indeed engage in acts of individual expression, where I unquestionably am the human author thereof. The primary source of me engaging in acts of personal expression are the facial expressions I make when viewing Youtube videos. A non-exhaustive list of representative examples include, but are not limited to the following timestamps:

    (a)     1:25:33 - 1:25:39
    (b)     1:27:50 - 1:27:54
    (c)     1:32:16 - 1:32:21
    (d)     1:33:57 - 1:34:00

---

1   See https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&Search%5FArg=Acerthorn&Search%5FCode=NALL&CNT=25&PID=qYyGIXMyPrY71aRvxAPg7xY9uie&SEQ=20220228160000&SID=1

    (e)       1:35:46 - 1:35:53

    (f)       1:36:52 - 1:37:04

    (g)      1:38:10 - 1:38:15

7. If I were taking a selfie, any one of those faces would be singularly sufficient individual creative expression to be entitled to copyright protection. Now, whether these expressions constitute sufficient commentary or criticism of the videos I was watching as to entitle me to a fair use defense for the infringement of those videos is another story, but since nobody with legal standing to sue me for that has yet to do so, that is not an issue we need adjudicate here.

8. In addition to that, there is the events which occur at timestamp 32:39 – 32:41, where you can hear me saying the words "kill you." Who exactly am I threatening to kill? *Am I even* threatening to kill anyone at all, or was I just thinking out loud? Most likely the latter, but it is ultimately immaterial.

9. These acts of personal expression, although scarce and de minimus, are nonetheless sufficient to create the minimum amount of creativity needed for copyright protection, even on their own, much less when combined together into one livestream.

10. The defendants in this case argue that my stream is not protectable by copyright because it only happened by accident.

… … … … … … … … … … … … … … … … … … … … … … … … … … … … … … …
… … … … … … … … … … … … … … … … … … … … … … … … … … … … … … …
… … … … … … … … … … … … … … … … … … … … … … … … … … … … … …

**Work of Authorship**

11. In the event that the Court insists on reviewing the defendants' challenges to the validity of my copyright, the defendants still cannot prevail.

12. To be eligible for copyright protection, a work must satisfy two requirements: It must be a "work of authorship" and it must be "fixed into a tangible medium of expression." See 17 USC § 102(a). To be considered a "work of authorship," two sub-criteria must be met: The expression must be created by a human being, and it must possess a minimum amount of creativity.

<u>Human Creation</u>

13. Copyright law in the United States does not give protection to works of art that are not created by human beings. Things such as a "photograph taken by a monkey," a "mural painted by an elephant," or a "claim based on driftwood that has been shaped and smoothed by the ocean," are not eligible for copyright protection. Similarly, "works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author" is likewise not eligible for copyright protection. See https://www.copyright.gov/comp3/chap300/ch300-

copyrightable-authorship.pdf (pp. 21-22).

14. It is upon this theory that the defendants seek to invalidate my copyright. But it is important to understand just what is being stated. The law does not state that the recording equipment coming on by mistake invalidates a copyright. It states that the *creation being recorded* must be made by a human. "For example, if an artist draws a faithful reproduction of a flower, she probably won't be able to prevent another artist from creating a very similar drawing of a flower since the flower belongs in the public domain." See https://www.findlaw.com/smallbusiness/intellectual-property/using-design-patents-and-copyrights-to-protect-nature-art.html. In this example, the drawing itself was done by a human, but the thing being drawn – a 1 to 1 recreation of a flower – is naturally occurring, and therefore not subject to copyright protection.

15. In the instant case, the facial expressions mentioned in ¶¶ 6-8 of this memorandum were unquestionably created by a human, even if I never intended for these expressions to ever escape the privacy of my home. As a result, the "human authorship" requirement is satisfied.

Minimum Creativity

16. To be eligible for copyright protection, at least a minimum amount of creativity must be part of the work. Works that are purely factual in nature, with no creativity behind them whatsoever (such as phone books or databases) are not subject to copyright protection. See Feist Publications, Inc. v. Rural Telephone Service Co., 499 US 340 (1991). However, "the requisite level of creativity is extremely low; even a slight amount will suffice." See *id* at 345.

17. The acts of expression mentioned in ¶¶ 6-8 of this Memorandum suffice to create the minimum creativity requirement. They may be scarce and minimal, but the law makes it clear that "minimal" is all that is required.

18. The individual defendants claim that I am not entitled to copyright protection on the grounds that, because the stream was an accident, it is a "factual" work, and factual works are not eligible for copyright. This is not the law. Biographies, documentaries, and textbooks are just three examples of predominately factual works that are still eligible for copyright protection. "Simply because a [work] documents an event does not turn a [visual] representation into a factual recitation." See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012). Rather, works that are *purely* factual in nature, with no creativity whatsoever, are not eligible for copyright protection. See Feist, supra. But only a small amount of creativity can overcome that restriction, and I have demonstrated that.

19. Now, if the individual defendants wanted to raise the affirmative defense of fair use, then you could make the argument that the second factor of fair use weighs in their favor. But even then, the second factor is typically considered the least important factor in a fair use determination, so it still

barely does the individual defendants any favors at all.

20. Put simply, there is nothing in the law even remotely suggesting that an accidental stream cannot be copyrighted, as long as it otherwise contains sufficient elements for copyright protection, which is human authorship and a minimal creative spark, just because the streaming software turned on by mistake. In fact, there is some precedent stating the opposite! It isn't from the Ninth Circuit, and it even predates the modern Copyright Act of 1976, but it is still there. I am referring to the case of Alfred Bell & Co. v. Catalda Fine Arts, 191 F. 2d 99 (2nd Cir. 1951), which stated that, while the original intent of the author was to create a faithful, 1-to-1 recreation of a public domain work (which would not be entitled to renewed copyright protection), he nonetheless made slight variations in the performance of the paintings. Despite these variations being accidental, they were nonetheless held by the second circuit to be sufficient grounds for an independent copyright, holding that "even if their substantial departures from the paintings were inadvertent, the copyrights would be valid. A copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations. Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it." See *id* at 105.

21. So there is indeed some precedent that accidental works are still subject to copyright protection. However, there is one additional element for copyright protection that needs to be addressed.

### Tangible Medium of Expression

22. This is where the "accident" actually happened. When I say the stream was an "accidental livestream," this is the part that I am referring to: Not any of the behavior that I exhibited during that livestream, but the fact that my stream was even turned on in the first place. Therefore, if the defendants wish to attack the validity of my copyright solely on the grounds that it was accidental, this is the part they need to attack.

23. To be eligible for copyright, the work must be "fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." See 17 USC § 102(a). "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." See 17 USC § 101.

24. The most important phrase in that definition, to the extent it matters in this case, is "by or under the authority of the author."

25. So this begs the question: When I say that the stream was *accidental*, what exactly does that

mean? Obviously, it does not mean that I turned on the stream software manually and deliberately. But if that is not what happened, then how did it come on?

26. There are two possible explanations for how exactly the stream came on:

- **Method #1**: I had accidentally pressed the key on my keyboard to turn the stream on without realizing I had done it.
- **Method #2**: The stream software came on entirely of its own accord, without any input from me, accidental or otherwise.

27. Method #1 is the more likely explanation, because if you look at the very start of the accidental stream, you can see that I am clearly sitting at my computer and typing at the keyboard. This makes it highly likely that the stream came on as a result of a single, errant keystroke.

28. But if that is what happened, then the fixation into a tangible medium of expression was still done *by the author*, just without the author realizing he had done it.

### "Under the Authority" of the author

29. This leaves Method #2 as the individual defendant's last bastion of hope for claiming that the stream was not "fixed" within the definition of the statute, and therefore invalidating my copyright.

### Mere metaphysical doubt

30. Now before I continue, I want to make this perfectly clear: Even if the Court disagrees with my upcoming argument, that does not save the defendants, or even necessarily reprieve them. In this section, I am not going to argue that Method #2 is not what happened; I am going to argue that, even if Method #2 is what happened, it is legally immaterial because my copyright is still valid nonetheless. Remember that this copyright is registered with the US Copyright Office. This means my copyright is presumed valid. While this presumption can be overcome with evidence, it is the defendants' burden to produce said evidence. I don't have to prove that my copyright is valid (although I am accepting that burden for the purposes of this motion); they have to prove that it is invalid.

31. So even if the Court disagrees with my upcoming argument that Method #2 is legally irrelevant, that alone does not save the defendants. Even then, they still have to *prove* that Method #2 is, in fact, what actually happened. They will almost certainly not be able to prove this, as the metadata needed to prove the origins of that specific stream (A) most likely no longer exist, (B) may never have existed in the first place, and (C) would be stored in my computer's logs anyway (which are not accessible to the public), and since I had no reason to believe that those logs would be relevant to this case until months later, I most likely would have purged them when I performed regular maintenance on this computer because I had no reason to think to keep them.

32. Because the defendants have a one in a million chance of proving these facts even if they could

legally exonerate them, the Court should still grant me judgment as a matter of law, because their odds of prevailing are just that: One in a million. "The issue of fact must be genuine. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." See Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 US 574, 586 (1986) (citations and quotations omitted).

33. So even if Method #2 could potentially exonerate the defendants, the Court should still grant me judgment in my favor unless the individual defendants can show that they have a reasonable likelihood of proving that if they had discovery.

34. Anyway, let's now discuss …

"Under the Authority" of the author

35. There is, not surprisingly, very little precedent on this matter. The closest case law I was able to dig up was the 1977 Supreme Court case of Zacchini v. Scripps-Howard Broadcasting Co., 433 US 562 (1977). However, even this case law is troublesome, seeing as it is not even a copyright case; it is a *right of publicity* case! However, several cases from the appellate courts have referenced this case while discussing the scope of the "by or under the authority of the author" clause of the Copyright Act, so there is at least a small amount of precedential value we can salvage from this case.

36. In Zacchini, the plaintiff had not consented to having his daredevil act video-taped by the defendant (who was a news media outlet), and sued for a violation of his right of publicity. Copyright cases that have referenced this case use this as an example of how a work, although fixed into a tangible medium of expression, was not done "by or under the authority of" the plaintiff, and therefore is not eligible for copyright protection. See Fleet v. CBS, INC., 50 Cal. App. 4Th 1911, 1920 n. 5 (1996); see also Baltimore Orioles v. Major League Baseball Players, 805 F. 2d 663, 675 n. 22 (7th Cir. 1986).

37. From this, we can piece together a rough guiding principle that "under the authority of the author" means that the author *consents* to having his work fixed into a tangible medium of expression. In other words, author consent creates author authority. So, with that being said, let's apply this legal standard to the case at hand. Did I *consent* to streaming that day?

38. So, it all comes to this: Can an author's consent to being recorded (and therefore, authority to be fixed into a tangible medium of expression, and therefore giving the author a valid copyright) ever be *retroactively* given? If Zacchini had *retroactively* consented to the recording of his act in exchange for some consideration (e.g. royalties), would that have given Scripps-Howard a valid and legally enforceable copyright?

39. Because if the answer is "yes," then it is axiomatic that I have retroactively consented to the

existence of that recording, provided that I am the copyright owner thereof. The very fact that I am currently litigating *this very case* demonstrates that I have retroactively given my consent.

40.     Because I have retroactively given my consent, then the fixation into a tangible medium of expression is likewise retroactively said to be done "under" my "authority," which in turn makes my copyright valid, assuming it was ever invalid to begin with[2].

41.     There is nothing in the copyright statute even remotely suggesting that retroactive consent from the author is any less valid for purposes of the fixation requirement than any other type of consent. Retroactive consent is upheld as legally valid by courts all the time, in all kinds of cases stretching across all aspects of law. The Copyright Act certainly gives no indication that it intends to have stricter definition of "consent" than is found in any other aspect of law. Therefore, by all accounts, retroactive consent to the recording satisfies the "fixation" requirement, plain and simple.

42.     Even if the Court disagrees with that assessment, the Defendants still find themselves in a pickle. As I explain in ¶¶ 42-43, it is actually far more likely that I accidentally pressed the start button to stream without realizing I had done it, which means that the fixation was still done "by" the author, and as I explain in ¶¶ 45-48, even if my retroactive consent to the fixation does not satisfy the statutory definition, the defendants still have to *prove* that the stream happened in the first instance entirely independent of my input, which is something they almost certainly will be utterly incapable of proving. Therefore, I am still entitled to judgment as a matter of law under the Matsushita precedent.

---

[2] See ¶¶ 25-30