David Stebbins (pro se Plaintiff)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                          PLAINTIFF

VS.                            Case 3:21-cv-04184-JSW

KARL POLANO, et al                                      DEFENDANTS

## OPPOSITION TO MOTION TO INTERVENE

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Opposition to Alphabet's and Youtube's motion to intervene.

## I – TABLE OF CONTENTS

| Section: | Page # |
|---|---|
| I.  TABLE OF CONTENTS | 1 |
| II.  TABLE OF AUTHORITIES | 3 |
| III. FACTS OF THE CASE | 4 |
| IV. SUMMARY OF ARGUMENT | 6 |
| V.  ARGUMENT & LAW | 8 |
| 1.  Leave to intervene should be denied. | 8 |
| A)  Intervenors have been dismissed already. Leave to intervene should be denied as that would be incompatible with the voluntary dismissal. | 8 |
| B)  Intervenors are indeed raising new claims. | 10 |
| 2.  My vexatious past is regrettable, but it is also just that: In the past, | 10 |

where it should stay.

  A) Apologies for aggravating the Court.     11

3. My Copyright is valid.          12

  A) The presumption of copyright     13

    validity is not within

    the Court's discretion.

  B) Defendants' hyper-literal       13

    interpretation of SAC

  C) Accidental works can        16

    still be copyrighted.

  D) USCO had contents of copyrighted   16

    work disclosed to them.

  E) There is minimal creativity     17

    in the April 10 stream.

  F) There is no evidence (aside from   19

    my poorly-worded SAC) that the

    work was not a result of

    human authorship.

4. Leave to Amend should be granted.   20

VI. CONCLUSION          22

## II – TABLE OF AUTHORITIES

**Statutes & Rules**                                    Page #

17 USC § 101                                            19

17 U.S.C. § 102(a)                                      12

17 USC § 410(c)                                         10,12,13

Fed.R.Civ.P. 41(a)(1)(i)                                5,6,8,9,22


**Case Law**                                            Page #

- Alfred Bell & Co. v. Catalda Fine Arts,              16
  191 F. 2d 99, 105 (2nd Cir. 1951)

- Commercial Space Management                           8,9
  Co. v. Boeing Co., 193 F. 3d 1074,
  1076 (9th Cir. 1999)

- Foman v. Davis, 371 US 178, 182 (1962)               20

- Haines v. Kerner, 404 US 519 (1972)                  15

- Hosseinzadeh v. Klein, 276 F.                         14
  Supp. 3d 34 (SD NY 2017)

- Lamps Plus, Inc. v. Seattle Lighting                  12,17
  Fixture Co., 345 F.3d 1140, 1145 (9th Cir. 2003)

### III – FACTS OF THE CASE

1.       I am a Youtuber and a Twitch streamer who goes by the online psuedonym "Acerthorn." I make videos and do streams on my eponymous Youtube and Twitch channels. On April 10, 2021, I had accidentally streamed approximately 1 hour and 43 minutes worth of content to my Twitch audience. I registered a copyright for that stream and put it on my Youtube channel, only viewable to those who paid my channel a fee of $20 per month.

2.       When I registered the copyright, the Court can take judicial notice of the fact that I necessarily uploaded a copy of the video for the Copyright Office to review. The Court can also take judicial notice of the fact that I literally called the work an "accidental livestream" when giving the title of the work. As such, the Copyright Office was constructively notified of the amount of creative spark (or lack thereof) was in the work, as well as the fact that the work was an accident, and made the sound judgment that the work was eligible for registration.

3.       Because providing a copy of this work as a public exhibit in this case would undermine the very copyright protection I seek to enforce, I will instead submit a copy of the accidental livestream directly to the judge's chambers.

4.       The individual defendants (Karl Polano, Frederick Allison, and Raul Mateas) began spreading around clips of this livestream without my authorization, specifically with the intent of enabling people to see the clips without paying me the licensing fee to see the clip. This infringement was only one step in a longstanding campaign of harassment and doxxing against me. I issued DMCA takedowns, and eventually, Karl Polano issued a DMCA Counter-Notification. This lawsuit ensued.

5.       When reviewing the complaint for failure to state a claim upon which relief can be granted, this Court affirmatively made the finding that "Plaintiff's complaint adequately alleges that he owned a copyright as the original and sole author of the April 10, 2021 video." See **Dkt. 10, p. 4, lines 22-23**. This was made despite the fact that the Court was well aware of the fact that I admitted the stream was accidental, and that I used the words "boring and contentless" to describe the stream. The district judge would later go on to adopt, almost verbatim, the findings of fact and conclusions of law of Magistrate Judge Corley on the validity of the copyright. See

**Dkt. 21, p. 3, lines 10-11**.

6.      All three individual defendants were entered in default for failure to appear. Meanwhile, the corporate defendants of Youtube LLC, Alphabet Inc., Discord Inc., Amazon.com Inc., and Twitch Interactive Inc. were all voluntarily dismissed from the action, pursuant to Fed.R.Civ.P. 41(a)(1)(A)(i), on April 11, 2022.

7.      Despite being dismissed from the case, Youtube and Alphabet have frivolously attempted to circumvent the dismissal by seeking leave to re-enter the case as intervenor defendants.

8.      In their motion to intervene, they have also raised a challenge to the validity of the copyright of the April 10, 2021 livestream, on the grounds that (A) accidental works are not copyrightable, (B) my livestream lacks any minimal creative spark, and (D) it was not created by a human. If granted, the motion to intervene would have the same effect as a motion to dismiss: Disposing of the case with prejudice, without allowing for discovery, solely on the sufficiency of the Complaint alone.

## IV – SUMMARY OF ARGUMENT

9.      First, the intervenors have already been voluntarily dismissed from this case. Therefore, their motion to intervene should be denied, because granting them leave to intervene would be tantamount to circumscribing, by adversary or by court, the voluntarily dismissal, and giving the defendants a means of fanning the ashes of the action back to life, which is absolutely not allowed a party is dismissed pursuant to Rule 41(a)(1)(A)(i).

10.     The intervenors are indeed raising new claims. Challenging the copyrightability of the April 10, 2021 stream is itself a new claim. It may be a negative defense (as opposed to an affirmative defense), but it is a new claim nonetheless.

11.     I have made many regrettable filings in the past. I will not (and cannot) deny that. But they are not relevant here. For the intervenors to attempt to bring up my litigation history in this context is essentially asking me to be punished for my past actions with a lack of access to the courts in the instant case, which is highly prejudicial.

12.     The presumption of validity of my copyright is not within this Court's discretion. The statute very clearly states that the Court only has discretion to entertain a presumption of copyright validity when the registration is made "thereafter," aka more than five years after the original publication of the work. Since that is not a factor in this case, my entitlement to presumption of a valid copyright is statutorily mandated.

13.     The Defendants reliance on the exact wording of my Second Amended Complaint as the sole grounds to claim that my copyright is invalid is entirely without merit. It relies on a hyper-literal interpretation of those words that were never intended by me. In fact, this hyper-literal interpretation does not even make sense in its own context.

14.     This Court has already determined that the Complaint (which is the only thing Intervenors rely on when challenging the validity of my copyright) alleges sufficient facts to give me a valid copyright. While the Court can change its mind, it should not do so lightly, and it should consider why it made its initial determination in the first place. If the reason for the initial determination was that the Court was giving me the benefit of the doubt that my words were meant figuratively rather than literally, well then … I rest my case.

15.     I did indeed disclose the amount of content (or lack thereof) to USCO, as evidenced by the fact that USCO necessarily had a copy of the accidental stream on hand that they could have reviewed for minimal creative content. I ask the Court to take judicial notice of that fact.

16.     Intervenors have not proven that I have acted with an intent to deceive USCO. Therefore, according to their own legal citations, I am still entitled to copyright validity.

17.     A work is still copyrightable even if it was created by accident. There is indeed precedent for this.

18.     There is indeed minimal creativity in the livestream. There is not much, but the law makes it clear that "not much" is all that is required.

19.     The law only requires the works of expression be man-made, not the affixation. Since the acts of expression, de minimus as they are, are clearly man-made, they "human authorship" requirement is met. Ruling that autonomous affixation forfeits copyright would create a dangerous slippery slope for live television and similar industries.

20.     The odds are overwhelmingly likely that the streaming software turned on as a result of an errant keystroke, rather than purely autonomous means. Therefore, the "human authorship" requirement is most likely met. At best, we would need discovery to determine if it was not a human authorship.

21.     If all else fails, leave to amend the complaint should be given. I have already requested leave to amend to include a new count of infringement. I should be given leave to file that amended complaint. Since the intervenors' entire case for invalidating my copyright begins and ends with the nuances of how I couched my Second Amended Complaint, I can easily correct those deficiencies in an amended complaint.

## V – ARGUMENT & LAW

22.     For the following reasons, Alphabet's and Youtube's motion to intervene should be denied.

### 1 – Leave to intervene should be denied.

23.     For the following reasons, the movants should not be allowed leave to intervene in this case.

<u>A – Intervenors have been dismissed already. Leave to intervene should be denied as that would be incompatible with the dismissal.</u>

24.     I have already filed a motion to strike the motion to intervene. See **Dkt. 142**. The Court denied that motion on the grounds that it only had the authority to strike pleadings, and motions to intervene were not counted among those. See **Dkt. 143**. However, it explicitly stated that I may raise those arguments in my opposition to the motion to intervene. I will do that now.

25.     Defendants Alphabet Inc., Youtube LLC, Discord Inc. Amazon.com Inc., and Twitch Interactive Inc., have already been dismissed from this case, pursuant to **Fed.R.Civ.P. 41(a)(1) (i)**.

26.     Pursuant to **FRCP 41(a)(1)(A)(i)**, the dismissal is automatic. The Court has no discretion to refuse it. See Commercial Space Management Co. v. Boeing Co., 193 F. 3d 1074, 1076 (9th Cir. 1999) ("a Rule 41(a)(1) dismissal, once filed, automatically terminates the action, and thus federal jurisdiction, without judicial involvement"). See also at 1077:

> "a court has no discretion to exercise once a Rule 41(a)(1) dismissal is filed. It is well settled that under Rule 41(a)(1)(i), a plaintiff has an absolute right to voluntarily dismiss his action prior to service by the defendant of an answer or a motion for summary judgment.
>
> The filing of notice itself closes the file. There is nothing the defendant can do to fan the ashes of that action into life and the court has no role to play. This is a matter of right running to the plaintiff and may not be extinguished or circumscribed by adversary or court. There is not even a perfunctory order of court closing the file. Its alpha and omega was the doing of the plaintiff alone. He suffers no impairment beyond his fee for filing.
>
> Because the dismissal is effective on filing and no court order is required, the filing of a notice of voluntary dismissal with the court automatically terminates

the action as to the defendants who are the subjects of the notice. The effect is to leave the parties as though no action had been brought." See id at 1077 (citations and quotations omitted).

27.     The law makes itself perfectly clear on this. Now that these defendants have been dismissed from the case, they cannot reignite their interest in litigating the case, for any reason.

28.     As a result, this Court must strike the defendants' motion to intervene, as that would effectively give the defendants a back door to allow them to fan the ashes of the action back into life, or to circumscribe (however indirectly) the dismissal by adversary or by court. Such a result is explicitly not allowed under the binding precedent.

29.     You don't have to like what I did. In fact, the Court has already explicitly made it clear that it *doesn't* like what I did. But be that as it may, "the whole point of a Rule 41(a)(1) dismissal is to give the plaintiff an 'absolute' way out without further judicial involvement." See Commercial, supra at 1079-80. Therefore, the Court must act in accordance with this absolute right.

30.     Any further attempts by the corporate defendants to circumscribe this dismissal, in any way shape or form, for any reason, should not only be met with sua sponte striking of their filings, but with sanctions to deter further taxations on the Court in spite of the clearly-established, black latter law to the contrary.  They are dismissed. The dismissal is absolute. There is nothing they can do, directly or indirectly, to fan the ashes of the action back to life. It's over. They're gone. Period.

31.     The defendants will still get their day in court. They just need to hold their horses. As the Defendants point out, they are involved in a sister case (Stebbins v. Rebolo) which has several common elements with this one. This means that they will indeed get their day in court. They just have to wait for this case to wrap up first. Alphabet's insistence on butting in on this case just comes off as severe impatience on their part. All the other defendants in that case (Creetosis, Just Emi, SidAlpha, etc.) seem to be waiting patiently for their day in court, so why can't Alphabet?

32.     If, despite my absolute right to voluntarily dismiss the corporate defendants, they still insist on butting in and having their day in court ahead of their allotted time, then they should, at the very least, be required to forego the possibility of ever recovering costs or attorneys fees

from this action. Why? Because at this point, those costs are self-inflicted. If they insist on throwing away tens (if not hundreds) of thousands of dollars prematurely litigating a case just on principle alone, then that's their money. But that's just it: It's *their* money, and it should forever remain *their* money, since at this point, they're spending it voluntarily.

B – Intervenors are indeed raising new claims.

33.     The movants claim that their motion to intervene is not prejudicial because it does not raise new claims. But this is not true. The intervenors are raising a challenge to the copyrightability of the April 10 stream. This is a negative defense, and because the defendants hold the burden of proof thereof (see **17 USC § 410(c)**), it is just as much a "new claim" as the affirmative defense of fair use. Therefore, because the intervenors are raising this, they are raising a new claim.

34.     Therefore, the motion to intervene is not proper.

**2 – My vexatious past is regrettable, but it is also**

**just that: In the past, where it should stay.**

35.     The intervenors bring up my history of vexatious litigation. Honestly, there is very little I can say in my defense to those accusations. Those filings were fueled by the arrogance of youth and a belief that, because I had read a few things there and there about the law, my legal theories were bullet proof. I regret many of the lawsuits I filed during that point in my life, and I absolutely regret the amount of money I requested. It was outright scandalous and I now freely admit that.

36.     However, at the same time, those lawsuits were filed a decade ago (in some cases, over a decade ago). To hold them against me, even all these years later, is nothing short of prejudicial and demonstrates a pettiness by the intervenors and an unwillingess to move forward with progress.

37.     As long as *this lawsuit* is meritorious and nonfrivolous, then I have the right to recover whatever relief (monetary or equitable) I am entitled to in *this lawsuit*. And the only way to know if *this lawsuit* is meritorious and nonfrivolous is to take *this lawsuit* on its own merit. To do otherwise would effectively strip me of my right to access to the courts as punishment for what

happened years and years ago. I humbly ask the Court to set aside the mistakes I have made in the past and focus exclusively on the case at hand.

38.     The intervenors have alleged that I have continued my vexatious tactics in this case. However, the only vexatious behavior they have complained about is the voluntary dismissal. However, while I acknowledge that the Court believes the dismissal was filed in bad faith, I am compelled to disagree. I never meant to "game the system." I merely meant to attempt to avoid precisely the kind of delay that the intervenors seek to perpetrate with the filing of this very motion to intervene. As we are about to see, I have a ready response to the intervenors' challenge to my copyright and I merely sought to prevent the delay of entry of judgment in this case.

39.     The Court obviously called it like he saw it when he accused me of acting in bad faith. But with all due respect, I do not agree that it was bad faith.

40.     Therefore, my vexatious behavior has not continued in this case.

<u>A – Apology to the Court</u>

41.     I understand that the Court has recently become frustrated with my filings in this case, particularly with my labeling of my motions with the prefix "emergency." I just want to take this opportunity to put on the record that it was never my intention to aggravate the Court. My motions were labeled as "emergency" because, if rulings were not issued immediately, then I risk suffering the very delay that the voluntary dismissal was designed to avoid. The Court would not rule on my motion for default judgment at the allotted time, owing to the fact that a conflicting motion was still pending. Therefore, immediate rulings were required.

42.     At least, that was my opinion. The Court has made it clear that it disagrees with my assessment of the situation. In **Dkt. 134**, the Court referred me to Local Rule 6-1(a), but with all due respect, that local rule says nothing about when a motion may be properly styled as "emergency." So it is unclear to me what I was supposed to notice by reviewing that local rule.

43.     I apologize to the Court for aggravating it, but I implore the Court to understand that I am not acting in bad faith. I just suck. I am doing the best I can. I cannot guarantee that I will not file motions in the future that are offensive to the Court, largely because I really have no way of knowing, until it's too late, what types of filings the Court will find offensive. I humbly ask the

Court to do its level best to meet me in the middle on this issue. I am willing to work with the Court if you are willing to work with me. Again, I'm not in bad faith. I just suck at this and I'm doing the best I can.

### 3 – My Copyright is valid.

44.    "Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression …." **17 U.S.C. § 102(a)**. "The sine qua non of copyright is originality. To qualify for copyright protection, a work must be original to the author. To be eligible for copyright protection, the underlying work must have a minimum creative spark, must be original, and must be created by a human.

45.    Applying for and being granted registration by the United States Copyright Office (or USCO, for short) within five years of the work's first publication creates a statutory presumption that the copyright is valid. See **17 USC § 410(c)**. The 9th Circuit has held held that "inadvertent mistakes on registration certificates do not invalidate a copyright and thus do not bar infringement actions, unless … the claimant intended to defraud the Copyright Office by making the misstatement." See Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1145 (9th Cir. 2003). It does not invalidate my copyright if I remain truthful throughout the application, but USCO, through no fault of my own, makes a mistake and grants registration to a work they probably should not have. Barring a showing of actual fraud, USCO's decision to grant registration (and therefore support a valid copyright and subsequent infringement actions) is not reviewable.

46.    However, that same precedent also held that "the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute reason for holding the registration invalid and thus incapable of supporting an infringement action." See id at 1145.

47.    Also, the intervenors' motion to intervene, if granted, would have the effect of a motion to dismiss: Disposing of the case with prejudice, without discovery, solely on the language of the Complaint itself. See **Dkt. 138-3, Line 22**. As such, the Court should treat the motion like a motion to dismiss. This means that the allegations of my complaint must not only be taken as

true, but in a light most favorable to me. That latter requirement is very important here.

<u>A – The presumption of copyright validity is not within the Court's discretion.</u>

48.      The intervenors argue that the statute of **17 USC § 410(c)** gives the Court discretion as to how much it may entertain a presumption of copyright validity. This is false. The statute clearly states that the Court has discretion in this regard when, and ony when, the registration is made "thereafter," aka more than five years after the date of first publication. Since that is not the case here, my entitlement to a presumption of copyright validity is statutorily mandated.

<u>B – Defendants' hyper-literal interpretation of SAC</u>

49.      The defendants' primary means of attacking the copyrightability of the April 10 stream comes from my own statements made during the Second Amended Complaint. Namely, they rely on my statements that "my livestream software turned on of its own accord" and the fact that, without the strange noises, the livestream was otherwise "contentless." To invalidate my copyright just on these admissions alone, the Court must construe these statements in a hyperliteral manner that was clearly not intended.

50.      It is often the job of the courts to determine which statements are meant to be literal and which are meant to be figurative. If you cannot tell the difference between the two, you have no business practicing law, because that is, very often, a deciding factor in many aspects of the law.

51.      First, when I said the streaming software "turned on of its own accord," that is clearly meant to be taken figuratively, not literally. It is, essentially, the same as if I said that some machine "only works when it feels like it." Everyone knows that machines don't work "when they feel like it" in the literal sense, owing to the simple fact that they don't have feelings, because they are just inanimate objects.

52.      Likewise, my statement that the streaming software turned on "of its own accord" was not meant to be taken literally, but figuratively, in order to convey that I don't know how the streaming software turned on!

53.      In fact, this interpretation of my Second Amended Complaint is the only one that holds up to scrutiny, given the full context. Remember: The whole point of ¶¶ 22-23 of the Second Amended Complaint was the emphasize that the stream happened by accident. As such, any

reasonable person would quickly ascertain that I didn't know how it happened, and that any efforts by me to guess as to how it happened are just that: A guess, not based on personal knowledge. If I actually knew what had caused the stream that would imply that I had enough wherewithal at the time the stream began to take a note of what caused it to happen. But if I had done that, then the stream would not have been an accident in the first place!

54. Therefore, my statement that the stream came on "of its own accord" is clearly meant to be a figurative, not literal, statement. It therefore cannot be used to singlehandedly invalidate the copyright. If the defendants want to challenge the validity of my copyright, they must actually engage in discovery and litigation as outlined below.

55. The defendants' reliance on the words "boring and contentless" is equally hyper-literal. It is just as hyper-literal as Matt Hosseinzadeh's interpretation of Ethan and Hila Klein's statement that "several months passed [and] nothing happen[ed]." See Hosseinzadeh v. Klein, 276 F. Supp. 3d 34 (SD NY 2017):

> "The only other allegedly defamatory statement explicitly identified by plaintiff is Ethan Klein's assertion that 'several months passed [and] nothing happen[ed]' prior to plaintiff's first settlement offer and threat of litigation … a statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced. Here, plaintiff argues that Ethan Klein's failure to mention that plaintiff sent a warning e-mail on August 2, 2016 makes Ethan Klein's statement that 'nothing happen[ed]' false and defamatory.
> …
> [V]iewing the Lawsuit video as a whole, the clear import of Ethan Klein's statement that 'nothing happen[ed]' is that defendants were surprised and disappointed by plaintiff's decision to file a lawsuit months after the Klein video was first posted on YouTube. Plaintiff's objection to the word 'nothing' is hyperliteral and based on a strained and unsupported interpretation of the Lawsuit video … Ethan Klein's statement that 'nothing happen[ed]' could easily refer to the fact that no action was filed in the intervening months, not that the parties had no communication." See id at 47-48 (citations and quotations omitted).

56. When I said that the stream was "contentless," I merely meant that the content contained therein would not have been sufficient, in my personal judgment, to compel me to do a stream on purpose just for this content alone. The content in that stream was like rainfall in the desert.

Geographers define a "desert" as a region with less than 4 inches of rainfall per year, but that still allows for some rainfall. Likewise, under the current copyright law, there is still sufficient creativity in the April 10 stream for there to be copyright protection in the first instance, even if I, personally, would not have chosen to make that work of my own accord.

57.     As we will soon see when I get to section V(3)(E) of this oppositional brief, it is clear that at least some things happened in the stream, and those things, minimal as they are (akin to rainfall in the desert, but still greater than zero, which copyright law says is all that is required) still show that my earlier statement that the stream was "contentless" was not meant to be taken literally.

58.     Consider this: The Court has already held that I have stated a plausible claim for ownership of copyright on this work, despite being aware of the language the intervenors seek to draw to the Court's attention. See ¶ 5 of this Oppositional Brief. Although the Court can change its mind and decide that I have not stated a claim upon which relief can be granted after all, I ask the Court to consider why it made that finding in the first place. Obviously, the Court knew that the work was accidental, that I described the streaming software as turning on "of its own accord," and that I used the word "contentless" to describe the stream. So why didn't it put two and two together before? Is it because the Court, knowing that the pleadings must be taken as true *and in a light most favorable to the Plaintiff* (emphasis added), and that pro se pleadings should be construed with liberality[1], the Court chose to give me the benefit of the doubt and assume that I was speaking figuratively rather than literally? If so, that just proves my point!

59.     Since the motion to intervene is tantamount to a motion to dismiss (see ¶ 8 of this Oppositional Brief), the Court must likewise hold the complaint, not just to be truthful, but also in a light most favorable to the plaintiff. In this case, that means holding ¶ 20-21 of the Second Amended Complaint to be partially figurative.

60.     Put simply, the defendants' insistence that the contents of my second amended complaint be treated as confessions as to the invalidity of the copyright are hyper-literal, unsupported by the evidence, and even unsupported by the total context in which those statements even appear. The second amended complaint is simply not dispositive in this instance.

---

1   See Haines v. Kerner, 404 US 519 (1972)

<u>C – Accidental works can still be copyrighted.</u>

61.     The intervenors argue that, because the work was an accident, that alone strips it of its eligibility for copyright protection. This is not true. Accidental works can indeed be protected by copyright. Alfred Bell & Co. v. Catalda Fine Arts, 191 F. 2d 99, 105 (2nd Cir. 1951) ("even if their substantial departures from the paintings were inadvertent, the copyrights would be valid. A copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations. Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it).

62.     Again, the Court knew that I classified the stream as accidental when it was screening my complaint for failure to state a claim upon which relief can be granted. Just like with the phrases "boring and contentless" and "of its own accord," this Court knew that the stream was an accident (and this time, that wasn't even a figure of speech), and yet it held that I have sufficiently alleged a valid copyright nonetheless. Although the Court can change its mind and issue a contrary holding on a motion to dismiss (which is what the motion to intervene is tantamount to), the intervenors have offered precisely zero explanation as to why the Court *should* change its mind and hold that the accidental nature of the work, in itself, strips it of copyright protection. Therefore, the Court should dismiss the intervenors' arguments out of hand.

<u>D – USCO had contents of copyrighted work disclosed to them.</u>

63.      The intervenors insist that I "failed to disclose" to the US Copyright Office that the stream was utterly devoid of any creative content. This is false. First of all, as we will soon see when I discuss section V(3)(E) of this oppositional brief, there is indeed minimum creativity. But even barring that, USCO had indeed been constructively notified.

64.     Please find, attached to this oppositional brief, a Request for Judicial Notice. This request asks the Court to acknowledge that (A) I called the work an "accidental livestream" when I registered the copyright, and (B) I had uploaded a copy of the work for USCO to review.

65.     Upon taking these two judicial notices, it becomes clear that I had indeed disclosed to USCO the very facts that the intervenors claim I did not disclose. USCO could clearly see the stream in question. They could see, with their own two eyes, how much creative expression was

or wasn't in the stream. Despite this, USCO made the sound determination that there was sufficient creativity in the video for me to be entitled to copyright registration.

66.    For this reason, the precedent requires that my copyright be deemed valid and that I be allowed to proceed with an infringement claim. See *Lamps Plus*, supra at 1144-47.

E – There is minimal creativity in the April 10 stream.

67.     Even barring all of this, the intervenors' insistance that "the video lacks even the slightest creative spark necessary for it to be copyrightable" is simply and demonstrably false.

68.    I will submit a copy of the accidental livestream to the Court's chambers for private viewing. At timestamp 40:02, you can see me taking a bite of hot dog before getting up and walking off camera. Almost immediately after I go off frame, you can hear strange noises that sound like barking and snarling. It is disputed whether or not I personally made these noises.

69.    The intervenors insist that this alone is not sufficient creativity to be entitled to copyright protection. But it is. Because I captured the noises using my streaming software, I am the copyright holder of these noises.

70.    But even barring that, there are plenty of other moments in the stream when I did indeed engage in acts of individual expression, where I unquestionably am the human author thereof. The primary source of me engaging in acts of personal expression are the facial expressions I make when viewing Youtube videos. A non-exhaustive list of representative examples include, but are not limited to the following timestamps:

    (a)    1:25:33 - 1:25:39

    (b)    1:27:50 - 1:27:54

    (c)    1:32:16 - 1:32:21

    (d)    1:33:57 - 1:34:00

    (e)    1:35:46 - 1:35:53

    (f)    1:36:52 - 1:37:04

    (g)    1:38:10 - 1:38:15

71.    If I were taking a selfie, any one of those faces would be singularly sufficient individual creative expression to be entitled to copyright protection. Now, whether these expressions

constitute sufficient commentary or criticism of the videos I was watching as to entitle me to a fair use defense for the infringement of those videos is another story, but since nobody with legal standing to sue me for that has yet to do so, that is not an issue we need adjudicate here.

72.     In addition to that, there is the events which occur at timestamp 32:39 – 32:41, where you can hear me saying the words "kill you." Who exactly am I threatening to kill? Am I even threatening to kill anyone at all, or was I just thinking out loud? Most likely the latter, but it is ultimately immaterial.

73.     These acts of personal expression, although scarce and de minimus, are nonetheless sufficient to create the minimum amount of creativity needed for copyright protection, even on their own, much less when combined together into one livestream.

74.     In addition to all of that, it is clear that many people are getting enjoyment out of watching the stream, which in turn means that there must be content therein. This is evidenced if you go the webpage of https://www.youtube.com/watch?v=Ldoz6eEAbMM. This is a blatant case of copyright infringement and I have attempted to have this content taken down via a DMCA Takedown Notice. When Youtube refused to take it down, I included it as "Infringement #33" in the Second Amended Complaint in the related case. See Case **4:22-cv-00546-JSW Stebbins v. Rebolo, Dkt. 16-1, ¶¶ 157-156**.

75.     However, rather than the video itself, take a look at the *comments section*. Clearly, people are having fun watching this video. That alone proves that there is *some content* in the video, even if the content was never intended to see the light of day.

76.     Representative examples of such comments include, but are not limited to, the following:

   (a)     "25:00 & 40:00 Looks like someone forgot to take their normal pills."

   (b)     "This is a mix of funny and a mix of sad because clearly he is unwell in the head. Acerthorn, if you're reading this: lmao"

   (c)     "This is like a fever dream just watching a found footage movie of a man descending into utter madness"

   (d)     "this is creepier than any pshycological horror movie i have ever watched, genuinely creeped out, this is real, it is actually real, it is scary af"

77.     Therefore, there is clearly some minimal creativity in this stream.

78.     Again, when I said the stream was "boring and contentless," I did not mean that it was utterly lacking in any minimum creative spark. That was a figure of speech. As I have clearly demonstrated, the accidental stream has, not much, but *enough* acts of individual expression to be entitled to copyright protection.

<u>F – There is no evidence (aside from my poorly-worded
SAC) that the work was not a result of human authorship.</u>

79.      To be eligible for copyright, the work must be "fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." See **17 USC § 102(a)**. "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." See **17 USC § 101**.

80.     So this begs the question: When I say that the stream was accidental, what exactly does that mean? Obviously, it does not mean that I turned on the stream software manually and deliberately. But if that is not what happened, then how did it come on?

81.     There are two possible explanations for how exactly the stream came on:

- **Method #1**: I had accidentally pressed the key on my keyboard to turn the stream on without realizing I had done it.

- **Method #2**: The stream software came on entirely of its own accord, without any input from me, accidental or otherwise.

82.     Method #1 is the more likely explanation, because if you look at the very start of the accidental stream, you can see that I am clearly sitting at my computer and typing at the keyboard. This makes it highly likely that the stream came on as a result of a single, errant keystroke.

83.     But if that is what happened, then the work was still done by a human being. Therefore, my copyright is still valid.

84.     The intervenors insist that Method #2 is what happened. However, their only evidence for this is their hyper-literal interpretation of the Second Amended Complaint. As I have demonstrated, that was never meant to be taken literally. In fact, the Second Amended Complaint makes it clear that *I don't know* how the streaming software came on, which means any attempts at explaining how it happened are just speculation, not based on personal knowledge.

85.     Because I have the registration, that means I have a statutory presumption of copyright validity, which means the defendants must come forth with affirmative evidence that Method #2 is the correct method. They have not done so yet. At best, we would have to conduct discovery in order to give the intervenors a chance to collect the required evidence, but the evidence is not present in the SAC itself unless you insist on a highly strained interpretation that was clearly not intended.

86.     For all of these reasons, the intervenors have not shown that my accidental stream was not copyrightable. There was indeed a minimum creative spark in the stream (even notwithstanding my allegation that I did not cause the strange noises), and it was almost certainly created by a human (me). Therefore, I am entitled to have my copyright be declared valid.

### 4 – Leave to Amend should be granted.

87.      If, despite all of this, the Court still insists that my Second Amended Complaint fails to sufficiently allege facts that would give rise to a valid copyright, then I should be granted leave to correct this deficiency in my complaint via a third amended complaint. There is no reason to suggest that an amended complaint would be futile.

88.     Is there any reason *not* to allow me to file an amended complaint to correct this deficiency? Is it just because the Court/intervenor defendants do not think I *deserve* to have a valid copyright?

89.     Amendment is not futile in this case, so leave to amend should be freely given. See Foman v. Davis, 371 US 178, 182 (1962):

> "Rule 15 (a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of

the movant, repeated failure to cure deficiencies by amendments previously
allowed, undue prejudice to the opposing party by virtue of allowance of the
amendment, futility of amendment, etc.—the leave sought should, as the rules
require, be 'freely given.' Of course, the grant or denial of an opportunity to
amend is within the discretion of the District Court, but outright refusal to grant
the leave without any justifying reason appearing for the denial is not an exercise
of discretion; it is merely abuse of that discretion and inconsistent with the spirit
of the Federal Rules."

90.     In fact, I am already seeking leave to file a third amended complaint, in order to allege a

new claim of infringement against Karl Polano. See **Dkt. 100**. I have filed a Motion to Clarify

asking the Court to explain how it wants to move forward regarding this new claim. See **Dkt.

126**.

91.     Because I am just going to be amending the complaint anyway, why not use this

opportunity to correct whatever deficiencies in the complaint I may have inadvertently given?

The Court can see the operative complaint in the related case of Stebbins v. Rebolo, so it knows

that I can modify the language of the complaint so as to make it more clear that it was most

likely created by a human. So as the Court can clearly see, these errors can indeed be corrected

by amended complaint.

**CONCLUSION**

92.      In conclusion, the intervenors should not be granted leave to intervene, because that would undermine the voluntary dismissal pursuant to Rule 41(a)(1)(A)(i).

93.      Even barring that, their only real defense on the merits – that my copyright is invalid – is patently untrue. The only way the Court could find the copyright to be invalid is if ALL of the following were to happen:

   (a)     The Court must insist on a hyper-literal interpretation of the Second Amended Complaint, even when the full context makes it clear that my statements were speculative rather than based on personal knowledge.

   (b)     When I stated in the SAC that the stream was "contentless," that statement in the SAC must supersede all other evidence, even that evidence which you can see just by viewing the stream in question, or by viewing other people's reactions to seeing the video by checking the comments sections.

   (c)     Uploading the video for USCO to review when granting registration does not count as disclosing to them how much or how little content is in the video.

   (d)     Leave to amend the complaint should not be given.

94.     If even one of those things does not happen, my copyright is still valid. Since that is not going to happen, my copyright is still valid. Period.

95.     I admit that I have been an overzealous and vexatious litigant in the past. But that is in the past, and I should not be punished in the instant case for things that happened years ago.

96.     In conclusion, the motion to intervene should be denied, and my copyright should be declared valid.

        So requested on this, the 29th day of April, 2022.

*/s/ David Stebbins*
David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com
